## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JAMES FICKEN, trustee,
SUNCOAST FIRST TRUST; and
SUNCOAST FIRST TRUST,

     Plaintiffs,

                                    Case No.: 8:19-cv-01210

vs.                                 State Ct. Case No.:19-003181-CI

CITY OF DUNEDIN, FLORIDA
et al.,

     Defendants.

_____/

### DEFENDANTS' DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendants, CITY OF DUNEDIN, FLORIDA, DUNEDIN CODE ENFORCEMENT BOARD (the "CEB"), MICHAEL BOWMAN, LOWELL SUPLICKI, ARLENE GRAHAM, KEN CARSON, WILLIAM MOTLEY, DAVE PAULEY, and BUNNY DUTTON (collectively, the "City"),[1] move for summary judgment pursuant to Fed. R. Civ. P. 56 against Plaintiffs JAMES FICKEN, trustee, SUNCOAST FIRST TRUST, and SUNCOAST FIRST TRUST ("Ficken" or "Plaintiff"), and state:

1.      This matter is proceeding on Ficken's Amended Complaint. (Dkt. 22). The City filed a Dispositive Motion to Dismiss and a Motion to Strike portions of it. (Dkt. 25). Ficken responded to both motions (Dkt. 30, 31) and both are pending before the Court.

---

[1] The individual defendants should be dismissed because a suit against a governmental actor in his official capacity is, in actuality, a suit against the governmental entity itself. See e.g. Braden Woods Homeowners Association, Inc. v. Mavard Trading, Ltd., 277 So.3d 664, 670 (Fla. 2d DCA 2019); Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991).

2.      Because there are no genuine issues of material fact, the City is entitled to summary judgment and respectfully requests this Court enter judgment for it and against Ficken.

## MEMORANDUM OF LAW

### I.      Facts Relied Upon for Relief.

#### A.      The Amended Complaint.

Suncoast First Trust is a Florida trust which owns the real property located at 1341 Lady Marion Lane in Dunedin (¶ 8).[2] Ficken is the sole trustee of the trust, its indirect beneficiary, and allegedly lives in the home located on the property. (¶ 9).

In May 2015, Ficken was cited by the City for having tall grass. He mowed the lawn promptly and was not fined. (¶ 67). Between then and July 2018, and while Ficken was out of town, the lawn became overgrown again and the City commenced a code enforcement action wherein it classified Ficken as a repeat violator. (¶¶ 70, 71). Plaintiff alleges the 2015 violation caused him to lose his entitlement to the notice and opportunity to be heard which non-repeat violators are afforded. (¶ 72). Plaintiff was never "afforded an opportunity to be heard before the City classified him as a 'repeat violator.'" (¶ 73).

Without notice, the City began fining Plaintiff $500.00 per day on July 5, 2018. (¶ 74). When he returned from out of town on July 19, 2018, the fine had accrued to $7,000, but Plaintiff was unaware he was being fined. (¶¶ 75, 76). Plaintiff attempted to mow his lawn around July 21, 2018, but his mower malfunctioned before he could finish. Thus, the fines continued despite his still having no idea he was being fined. (¶ 77). This was so because he was classified as a repeat violator and the City provided no such notice. (¶ 77).

---

[2] References in this section are to the numbered allegations of the Amended Complaint (Dkt. 22).

On August 20, 2018, a City code enforcement officer advised him he was "going to get a big bill from the city." (¶ 78). He asked the officer to return in two days, by which time the lawn would be mowed. Later that same day Plaintiff went to Wal-Mart and purchased a new lawnmower. (¶ 80). He cut the grass the next day, by which time the fine had been running for 48 days and, by the time he learned of it, he owed the City $23,500. (¶ 82).

Around August 21, 2018, he received a letter from the City providing him with formal notice of the daily fines and advising him of a hearing on the fines scheduled for September 4, 2018. (¶ 83). Because he was scheduled to be out of town, he made two requests to postpone the hearing. Both were rejected. He was told to arrange to have someone appear on his behalf, but he was unable to do so. (¶ 84). On August 31, 2018, the City began fining him again for having overgrown grass, and again he was unaware of the fines, presumably because he was classified as a repeat violator and was not provided notice. (¶ 86).

On September 4, 2018, the hearing went forward in his absence. The code enforcement officer testified that the property was in violation from July 5 to August 20, and that a second action had begun on August 31 and was still pending. (¶ 87). A fine of $500 per day for each day the violation existed, plus interest, was imposed as to each violation. (¶ 88). On September 11, 2018, the lawn was mowed and the fine ceased. (¶ 89, 90). On September 18, 2018, the City placed the first of two liens on the property. (¶ 91). The first totaled $24,454.36 and the second $5,379.14. (¶¶ 91, 92).

Thereafter, Plaintiff submitted a request for rehearing or reconsideration of the fines, but the request was rejected without explanation, though it is alleged the request was denied because the City has a policy of not negotiating with repeat violators. (¶ 95). Plaintiff was warned that interest would continue to accrue on the liens. (¶ 96).

Later, Plaintiff was advised by the City Attorney that the liens must be paid or the City would commence foreclosure proceedings to secure the fines owed. His efforts to obtain an extension of time for compliance with the City Attorney's demand were rejected without a counteroffer, and on May 7, 2019 the City Attorney was granted permission to foreclose on the non-homesteaded property in order to recover the liens. (¶¶ 97, 99-100).

**B.**      **The evidence.**

The Amended Complaint casts Ficken as the gobsmacked and unwitting victim of the City's code enforcement system, but the evidence shows that he is an absentee and neglectful real estate investor who failed repeatedly to maintain his property. Moreover, Ficken was explicitly notified of his status as a repeat violator and had the opportunity to be heard in 2015 and 2018 before a daily accruing fine was imposed. His allegations to the contrary are demonstrably false.

**1.**      **The property at issue, 1341 Lady Marion Lane.**

Ficken is the settlor and trustee of Suncoast First Trust, which acquired the Lady Marion property with cash in 2007 in order to "renovate and resell it." (Ficken at 96-97).[3] He contends it is his home, but he is also the sole settlor, trustee, and beneficiary of the Clearwater Residential Living Trust, which was created in the mid-1990s and owns the property located at 1608 North Osceola Avenue in Clearwater, Florida (the "Clearwater property"). (Ficken at 28-29). Ficken personally owned the Clearwater property before conveying it to the Clearwater Residential Living Trust in the mid-1990s, and he has claimed a homestead exemption on it every year thereafter, including the years at issue in this case. (Ficken at 74-78). He has not changed the statutory homestead exemption to the Lady Marion property because of the possible tax implications and

---

[3]   Refers to the deposition transcript of James Ficken taken September 25, 2019 and filed contemporaneously herewith.

because it is his intention to repair the Clearwater property and move back into it. (Ficken at 97). His driver's license and voter information card show the Clearwater property as his residence. He has no vehicles registered in Florida but two bearing South Carolina registrations. (Ficken at 148-153).

On March 17, 2015, City Code Enforcement Inspector Mike Kepto issued via regular mail and email a Notice of Violation for overgrown grass at the Lady Marion property which directed Ficken to correct the violation by March 29, 2015. (Ficken at Ex. 23; McHale at ¶ 44[4]). Ficken had been in Columbia, South Carolina since August 2014 attending to his elderly mother "with the occasional trip back to Pinellas County," though he acknowledges he was still responsible for the maintenance of his various properties during his absences. (Ficken at 103). According to Kepto, the Lady Marion property was "such a problem property. It was kind of a joke that [he and fellow Code Enforcement Inspector Thomas Colbert] were the property managers for Mr. Ficken. The only time [Ficken] would take any action was when we notified him and, yet, we were getting complaints about the property on a regular basis." (Kepto at 13).[5]

On March 30, 2015, one day past the date set for compliance, Ficken emailed Kepto requesting more time to mow the lawn because he was out of town attending to his mother and would not return until the week of April 12, 2015. He indicated that he "should be able to mow the lawn that week." Kepto advised later that day that he would not extend the compliance date "based on the past history for this property. . ." Kepto further advised Ficken that:

> This case will be presented to the Code Enforcement Board and
> ANY time in the next five years we document that the property is

---

[4] Refers to the affidavit of Joan McHale, the custodian of the City's code enforcement records custodian, filed contemporaneously herewith.
[5] Refers to the deposition of Michael Kepto taken February 18, 2020 and filed contemporaneously herewith.

overgrown you could receive up to a $500 PER DAY lien as a 'Repeat Violation.' I would strongly suggest that you schedule regular mowing for this property to prevent any liens being placed.

(Ficken at Ex. 23) (emphases in original).

On April 3, Ficken expressed his disappointment that Kepto declined to extend the compliance date and offered a litany of reasons why the property was not maintained: he didn't have the contact information for a car repair service and couldn't transport his mower; a lawn service he tried to contact didn't respond; he searched his banking records to identify a previous lawn service provider; he found that provider, but the provider's lawnmower was broken; the provider quickly got a new one but had to catch up on other clients before he cut the Lady Marion property. (Ficken at Ex. 23, 4/3/15 email).

In response, Kepto told Ficken the case would be presented to the CEB despite the lawn having been mowed on April 7 by an unknown person. (Ficken at 107). He predicted that "[t]he Board will find that you were NOT in compliance by the compliance date however you ARE in compliance now," and again indicated that repeat violations "could result in a higher fine of up to $500 per day." Critically, Kepto wrote that "[t]his is to encourage you to maintain the property without Code Enforcement becoming your property manager advising you of the condition of the property." (Ficken at Ex. 23). The matter was set for hearing before the CEB on May 5, 2015.

Ficken requested a continuance because he was unable to travel to Florida and did not appear at the hearing personally, instead sending a former neighbor. (Ficken at 113-114, Ex. 23; May 5, 2015 transcript[6]). Ficken testified that could have attended a CEB hearing only within a five-day window occurring every sixty days, when Ficken was relieved of the care of his mother.

---

[6] Refers to the transcript of the CEB hearing held May 5, 2015 and filed contemporaneously herewith.

(Ficken at 104, 112). He spent all but about forty days of 2015 in South Carolina. (Supp. Resp. to 2d INTs).[7]

The hearing proceeded on May 5 and Ficken was found in violation during the time alleged by Kepto. On May 13, 2015, the CEB issued its written order reflecting same. Ficken was not fined, but the CEB's order indicated that "[t]his matter is deemed to be of a recurring nature and should it recur, by law the Board can levy fines up to $500.00 per day. . ." Ficken signed for the order on June 20, 2015. (Ficken at Ex. 23; McHale at ¶ 57). He neither asked the CEB to reconsider the order nor appealed it. (Ficken at 116). Nevertheless, and despite having received the CEB's order explicitly informing him of same, Ficken alleges that he was unaware this violation "would result in a 'repeat violator' classification." (Dkt. 22 at ¶ 72).

As indicated by Kepto's comment concerning the "history" of the Lady Marion property, the 2015 violation was not the first time it was overgrown. Ficken previously had been contacted by code enforcement inspectors twelve times and been issued *ten* notices of violation for overgrowth on the property. (McHale at ¶¶ 12-43). In response, he "managed to get the grass cut" within the time set for compliance. (Ficken at 117-119).

On August 22, 2018, Code Enforcement Inspector Thomas Colbert issued a Notice of Repeat Violation, for the property was again overgrown with weeds and grass. (Ficken at Ex. 24; McHale at ¶ 66). Colbert inspected the property on July 5, 2018 in response to a female caller who

---

[7]  Refers to Ficken's supplemental responses to the City's Second Interrogatories dated April 1, 2015 and filed contemporaneously herewith. Ficken testified that he has spent seven or eight months of each year in Dunedin following his mother's passing in 2016, but the interrogatory responses show he spent most of his time in South Carolina from 2016 to 2018. Whether Ficken lived in Dunedin or Clearwater or South Carolina, he always remained responsible for the property's maintenance.

complained about the ongoing overgrowth. (Colbert at 91).[8] An accompanying "Notice of Hearing

Repeat Violation" advised Ficken that the violation would be heard before the CEB on September

4, 2018 at 2:00pm. The notice provided as follows:

> If you wish to present your side of the case, you must appear before
> the Code Enforcement Board on that date. Failure to appear may
> result in the Board proceeding in your absence. Should you be found
> in violation of the above Code, the [CEB] has the power by law to
> levy fines of up to $500.00 a day against you and your property. . .
> Should you desire, you have the right to obtain an attorney, at your
> own expense, to represent you before the Board. ***You will also have
> the opportunity to present witnesses as well as question the
> witnesses against you prior to the Board making a determination***.

(Ficken at 121-122, Ex. 24; McHale at Ex. 33) (emphases supplied).

Colbert executed an affidavit the same day that the Notice of Hearing was (1) mailed to

Ficken via certified mail; (2) posted on the Lady Marion property; and (3) posted at the City's

offices. (Ficken at Ex. 24 (Affidavit of Service); McHale at Ex. 36). Ficken did not receive the

mailed notice until the third week of September because he was out of town beginning on August

25 and the post office was holding his mail, but learned of the scheduled hearing on August 23 or

24 because he "happened to . . . be by the property"[9] and retrieved the posting. (Ficken at 121-

124).

On August 24, Ficken requested a continuance of the hearing because he had pre-arranged

travel. (Ficken at 121-124). Ficken admitted the violation but noted "I believe the property was

also in compliance from 7-21-18 to on or about 8-11-18." (Ficken at Ex. 24, 8/24/18 letter). The

same day, he delivered a letter to be presented to the CEB if the continuance was denied. Ficken

---

[8]   Refers to the deposition transcript of Thomas Colbert taken February 19, 2020 and filed
contemporaneously herewith.

[9]   He "happened to be by" the property in which he claims to have lived.

wrote that "I admit the repeat violation, but dispute the period(s) of non-compliance." Following the 2015 violation, he was "able to maintain the property for more than three years of my five years potential repeat offender status," but that his focus had been on tending to his mother and her affairs following her death. Further, his lawnmower had malfunctioned in July and "the gentleman who previously repaired the mower died during my most recent absence." (Ficken at Ex. 24, second 8/24/18 letter). Ficken tried to fix the mower three times around August 12 but, having failed, purchased a new mower following Colbert's warning of "the impending action" on August 20.[10] According to Ficken, "I now have a reliable machine for when I'm here, and have hired a firm, my fourth over the years, to cut the yard when I'm gone." (Ficken at Ex. 24, second 8/24/18 letter). On August 30, Ficken sent another letter to the CEB for inclusion in the hearing record. (Ficken at Ex. 24, 8/30/18 letter).

Ficken could not attend the hearing, so he asked Kristen Mendez to attend in his stead. (Ficken at 126-127). Ficken and Mendez have no relationship whatsoever. (Mendez at ¶ 11[11]; Ficken at 127). Mendez is a real estate agent who drove by the Lady Marion property in late summer 2018 while in the neighborhood looking at another property. (Mendez at ¶ 3-4). The property appeared unoccupied because "[t]he lawn was not mowed, it was generally unkempt, there were no cars in the driveway, and the property appeared out of place for the neighborhood because the other properties were neat and well-maintained." (Mendez at ¶ 5). Thinking the owner

---

[10]   The date of Ficken's interaction with Colbert is a disputed fact, but not a material one. Ficken alleges the conversation to have occurred on August 20. Colbert first recalled it as July 5, 2018, when he originally observed the violation (Colbert at 111), but acknowledged documentation indicating Ficken may have been out of town until July 19. (Colbert at 148-149). Taking Ficken's testimony as true, it is not material as a verbal warning is not required in any event.

[11]   Refers to the affidavit of Kristen Mendez, filed contemporaneously herewith.

might wish to sell it, Mendez contacted Ficken. Ficken indicated he did not wish to sell, but Mendez informed him she would list it if he changed his mind. (Mendez at ¶¶ 6-7).

Later, Ficken contacted Mendez and asked her to attend the September 4 CEB hearing. (Ficken at 127; Mendez at ¶ 8). Ficken said that Mendez first agreed to attend the hearing on September 4, then told him that she would not be able to appear. (Ficken at 127). Mendez said she never agreed to go. Instead, she ran Ficken's request by her supervising broker, who advised against it. She told Ficken that she could not attend, though she does not remember when. (Mendez at ¶¶ 9-10). Ficken was unable to find anyone else to attend the hearing on his behalf. (Ficken at 127-128).

The matter was heard on September 4, 2018.[12] The CEB issued two written orders, which Ficken received when he returned from South Carolina in late September 2018. (Ficken at 140-141). The first found him in violation from July 5, 2018 through August 20, 2018 and imposed a fine of $500 per day for each of those days. (Ficken at Ex. 24; McHale at Ex. 42). The second imposed a similar fine beginning on August 31, 2018 until compliance was achieved. (Ficken at Ex. 24; McHale at Ex. 43). Colbert later filed an Affidavit of Compliance indicating that compliance was achieved on September 10. (Ficken at Ex. 24; McHale at Ex. 45). The CEB accepted the affidavit on October 8, 2018. (Ficken at Ex. 24; McHale at Ex. 48). Thus, despite Ficken's assertion that he had a reliable mower as of August 24 and an arrangement to keep the property maintained in his absence, it remained untended from August 31 through September 10, 2018.

---

[12] A transcript of the hearing is filed contemporaneously herewith.

Thereafter, Ficken submitted to the CEB a Petition to Reconsider or Rehear alleging there was relevant evidence that was not available due to his absence. (Ficken at 142, Ex. 24; McHale at Ex. 46). He alleged, among other things, that he learned on July 18 that the man who was previously cutting the grass in his absence, Russ Kellum, had passed away.[13] Ficken's Petition to Reconsider was amended thereafter. (Ficken at 144, Ex. 24; McHale at Ex. 51). The CEB heard it on November 6, 2018 with Ficken in attendance[14] and denied it in writing on November 14. (Ficken at 146-147, Ex. 24; McHale at Ex. 52). Ficken did not appeal any of the orders. (Ficken at 147).

In April 2019, having unsuccessfully attempted to obtain a settlement offer from Ficken he could bring to the City's Board of Commissioners, City Attorney Thomas Trask requested and received the CEB's permission to foreclose the lien created by the orders. (Trask at 176-181; McHale at ¶ 88, Ex. 55).[15] This lawsuit was filed on May 7, 2019.

### 2.    Other properties.

Starting in the mid-1990s, Ficken has served as the settlor and trustee of numerous other land trusts owning residential property in Pinellas County. (Ficken at 20-36). Some of the properties have been flipped, while some remain in the land trusts created by him. (Ficken at 23-

---

[13] Kellum is the man who was claimed by Ficken in his August 24 letter to have repaired Ficken's mower previously. (Ficken at 132). Kellum's alleged role appears to have changed in the time between the August 24 letter and the Petition to Reconsider, from the man who previously repaired the mower to the man who periodically mowed the grass. (Ficken at 132). Asked if Kellum also mowed other properties controlled by Ficken as trustee, Ficken replied "I think so." (Ficken at 132). Ficken may have been attempting to curry favor with the CEB by implying that he had someone maintaining the property during his frequent absences from the state.

[14] A transcript of the November 6, 2018 CEB hearing is filed contemporaneously herewith along with a copy of the CEB's rules of procedure.

[15] Refers to the deposition of Thomas J. Trask, Esq., taken as the Defendants' corporate representative on January 13, 2020 and filed contemporaneously herewith in two volumes.

27, 35-36). The beneficiary of these trusts was or is the Marinelle E. Ficken Living Trust, for which Ficken is also the settlor and sole trustee and whose beneficiaries are Ficken and his sister, Pamela Day. (Ficken at 32-33).

Another of his trusts, the Old Bay Trust, formerly owned the properties located at 1604 and 1606 North Osceola Avenue in Clearwater. Around 2005, Ficken exchanged the 1606 North Osceola Avenue property for an interest in a commercial property in New Jersey, while 1604 North Osceola began generating income and was sold. (Ficken at 38-43).

The Eastlake Weir Trust acquired in the mid-1990s and still owns property at 14557 Southeast 139th Lane in Marion County, FL. (Ficken at 44, 29-31). Though Ficken is responsible for the property's condition, he does not use a property manager and does not know if there is still a home on the property because he has not been there in at least five years. (Ficken at 49). A proceeding to demolish the structure was begun by Marion County due to its unsafe condition, but Ficken does not know if the structure was, in fact, demolished. (Ficken at 55, Ex. 4-7; Causie at Ex. 3[16]).

Between 2007 and 2018, Pinellas County cited Ficken's Suncoast Eighth Trust ten times for housing code violations, accumulation of trash, and overgrown grass and weeds at 1328 Illinois Avenue, Palm Harbor. The ten notices of violation, sent to trustee Ficken at the Lady Marion property in Dunedin, provided as follows:

> If the violation is corrected and then repeated, or if the violation is not corrected by the above specified time, the case may be brought for hearing even if the violation is corrected prior to the hearing. Subsequent violations of this same section of the Code may result in immediate imposition of fines without additional notice.

---

[16] Refers to the affidavit of Stacie Causie, custodian of the applicable records for Marion County, filed contemporaneously herewith.

(Ficken at Ex. 8, 9, 10, 11, 12, 13, 14, 15, 16, 17; Dunne affidavit[17]).

Ficken does not dispute the violations but does not have specific recollection of having received the notices. (Ficken at 57, 63-72). He does not tend to the property on a regular basis or when called for by its condition, but rather when he has time available to "deal with the property." (Ficken at 72-74).

As to the homesteaded Clearwater property, Ficken has been cited approximately nineteen times for various code violations at the property, including at least five times for excessive growth or accumulation of weeds and grass. (Ficken at Ex. 18; Watkins affidavit[18]). Ficken does not deny that some or all the violations existed or that the notices were sent to him. (Ficken at 80). He was found guilty by a county court judge of at least one violation, but corrected the issues raised by the others. (Ficken at 81).

Ficken's Suncoast Third Trust owns the property at 53 Highland Avenue in Dunedin. Ficken acquired the property around 2006 or 2007 in order to "flip" it, but has used it in the interim only to store household goods left behind by the previous owner. (Ficken at 94-95). It was cited by the City in 2010 and 2011 for overgrowth. (Ficken at Ex. 19, 20; McHale at ¶¶ 90-103). In August 2014, it was cited for multiple code violations. The notice advised Ficken that "[r]epeat violators can be fined up to $500.00 per day. Such charges will be a lien upon the real and/or personal property of the violator and may be collected pursuant to law." (Ficken at Ex. 21, 8/21/14 Notice; McHale at Ex. 58). The date set for compliance by the code inspector was extended almost eight weeks due to the inspector's delay in responding to Ficken's request for an extension of

---

[17] Refers to the affidavit of Angela Dunne, custodian of the applicable records for Pinellas County, filed contemporaneously herewith.
[18] Refers to the affidavit of Sherry Watkins, custodian of the applicable records for the City of Clearwater, filed contemporaneously herewith.

time—Ficken had advised the inspector on September 7, 2014 that he would be out of town until late October. The matter was ultimately heard by the CEB in March 2015, when Ficken was determined in violation of the code noted in the board's order, and on May 5, 2015, when Ficken was determined to be in compliance. (Ficken at Ex. 21; McHale at ¶ 119, Ex. 65). The CEB did not fine Ficken. The May 5 hearing is the same hearing at which he was found in violation, but not fined, on the Lady Marion property. In August 2018, the Highland Avenue property was again cited for overgrowth of grass or weeds and for parking an inoperative motor vehicle. (Ficken at Ex. 22; McHale at Ex. 68). Ficken cut the grass and moved the vehicle, so the matter was not referred to the CEB. (Ficken at 92; McHale at Ex. 68).

## II.   Law.

### A.  Chapter 162, Fla. Stat. and the City's Code of Ordinances.

Though Plaintiff's counsel has attempted to disavow them, the starting point for analysis of this case is the code enforcement process set forth in Chapter 162, Fla. Stat., and Chapter 22 and Dunedin Code of Ordinances ("DCO").

The Local Government Code Enforcement Boards Act, §§ 162.01, et seq., Fla. Stat. (2018) (the "Act"), provides a comprehensive code enforcement scheme for local governments. The Act's intent is to:

> . . . promote, protect, and improve the health, safety, and welfare of the citizens of the counties and municipalities of this state by authorizing the creation of administrative boards with authority to impose administrative fines and other noncriminal penalties to provide an equitable, expeditious, effective, and inexpensive method of enforcing any codes and ordinances in force in counties and municipalities, where a pending or repeated violation continues to exist.
>
> § 162.02, Fla. Stat.; see also § 22-1, DCO, expressing the same intent.

Municipalities may create a code enforcement board or appoint a special magistrate with the authority to "hold hearings and assess fines" against violators of municipal codes and ordinances. §§ 162.03 (1) and 162.03 (2), Fla. Stat.; § 22-41, DCO. The City has created a code enforcement board in compliance with the statute. Id.

A "code inspector" or "code enforcement officer" is "any authorized agent or employee of the . . . [municipality] whose duty it is to assure code compliance." § 162.04 (2), Fla. Stat.; § 22-42, DCO. It is the "duty of the code [inspector] to initiate enforcement proceedings of the various codes." § 162.06 (1), Fla. Stat.; § 22-71 (a), DCO.

A "repeat violation" means a violation of a provision of a code or ordinance by a person who has been previously found through a code enforcement board to have violated or who has admitted to violating the same provision within five years prior to the violation, notwithstanding the violations occur at different locations. § 162.04 (5), Fla. Stat.; § 22-42, DCO.

Section 162.06 (2), Fla. Stat., sets forth the procedures to be followed if the code inspector finds a violation. See also § 22-72, DCO. Section 162.07 (4), Fla. Stat. and  § 22-75, DCO, state that "[a]t the conclusion of the hearing, the enforcement board shall issue findings of fact, based on evidence of record and conclusions of law, and shall issue an order affording the proper relief consistent with powers granted [herein]." The "order may include a notice that it must be complied with by a specified date and that a fine may be imposed … if the order is not complied with by said date." Id.

If the violation is not corrected by the date set in the order, "[a]n enforcement board, upon notification by the code [inspector] that an order of the enforcement board has not been complied with by the set time . . . may order the violator to pay a fine in an amount specified in this section for each day the violation continues past the date set by the enforcement board for compliance. .

." § 162.09 (1), Fla. Stat.; § 22-79 (a), DCO. An enforcement board may also order the violator to pay a fine "upon finding that a repeat violation has been committed. . ." § 162.09 (1), Fla. Stat.; § 22-79 (a), DCO. A daily fine associated with a repeat violation accrues "for each day the repeat violation continues, beginning with the date the repeat violation is found to have occurred by the code inspector." Id. In determining the amount of the fine, the board must consider the gravity of the violation, any actions taken by the violator to correct the violation, and any previous violations committed by the violator. § 162.09 (3), Florida Statutes; § 22-80 (a), DCO. The City's code provides a fourth criteria, "[t]he courtesy and cooperation the violator extends to the code enforcement officer." § 22-80 (a) 4, DCO.

Fines imposed under both the Act and the DCO shall not exceed $250 per day for a first violation and $500 for a repeat violation and may also include all costs of repair. § 162.09 (2) (a), Fla. Stat.; § 22-79 (d), DCO. Section 162.09 (1), Fla. Stat., and § 22-79 (c), DCO state that "[i]f a finding of a violation or a repeat violation has been made as provided in this [part], a hearing shall not be necessary for issuance of the order imposing the fine." An enforcement board "may," but is not required to, reduce a fine imposed pursuant to the respective authority. § 162.09 (c), Fla. Stat.; § 22-80 (b), DCO. Section 162.09 (2) (a), Fla. Stat. and § 22-79 (d), DCO, impose a $5,000 cap on irreparable code violations.

Addressing repeat violations, § 162.06 (3), Fla. Stat. and § 22-73, DCO, require the code inspector to notify the violator, but do not require a violator to be given a reasonable time to correct the violation and do not prescribe when the violator is to be notified of the violation. Upon notifying the violator of a repeat violation, the code inspector shall notify the enforcement board and request a hearing. The case may be presented to the enforcement board even if the repeat violation has been corrected prior to the board hearing. § 162.06 (3), Fla. Stat. and § 22-73, DCO.

A certified copy of an order imposing a fine may be recorded in the public records and shall thereafter constitute a lien against the land on which the violation exists and upon any other real or personal property owned by the violator. § 162.09 (3), Fla. Stat.; § 22-81, DCO. An imposed fine accrues until the violator comes into compliance or until judgment is rendered in any suit filed. Three months from the filing of any such lien, the enforcement board may authorize the local governing body attorney to foreclose on the lien or sue to recover a money judgment for the amount of the lien plus accrued interest (though liens on homesteaded property are not subject to foreclosure). § 162.09 (3), Fla. Stat.; § 22-81, DCO. Following the foreclosure sale, the local government is entitled to full payment of the lien. Any remaining surplus is returned to the former property owner. § 45.032, Fla. Stat.

Finally, and critically, an aggrieved party may appeal to the circuit court within thirty days a final administrative order of an enforcement board. § 162.11, Fla. Stat.; § 22-83, DCO.

The City conducts code enforcement consistently with and under the authority of Chapter 162, Fla. Stat. and Chapter 22, DCO. (See generally Trask deposition transcript).

## B. The City is entitled to summary judgment on Counts I and II because the fines at issue are not excessive under the Eighth Amendment or the Florida Constitution.

In Counts I and II, Plaintiffs claim that the daily accruing fine of $500, the aggregate fine of over $29,000, and the foreclosure of the Lady Marion property are unconstitutional under the Eighth Amendment to the United States Constitution and the parallel provision of the Florida Constitution. (Dkt. 22 at ¶¶ 106-108; 110; 117-124; 125). (Dkt. 22 at 110, 125). Though Plaintiff's counsel has asserted in writing that Plaintiff does not challenge in this suit the constitutionality of Chapter 162, Fla. Stat. or Chapter 22, DCO (Dkt. 36-1 at 41) and instead argues the City's "system of boundless fines is unconstitutional on its face and of course as-applied here" (Dkt. 36-1 at 41), the City contends the matter cannot be extracted from the codified law which governs it.

17

**1.    The daily accruing fine falls within the range authorized by the Florida Legislature and is not excessive.**

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality." Austin v. United States, 113 S.Ct. 2801, 2812 (1993). No case explicitly instructs how such proportionality is to be considered, but the "[t]he relevant factors" concerning the excessiveness of a fine "will necessarily vary from case to case." United States v. One Parcel Prop. Located at 427 & 429 Hall St., 74 F.3d 1165, 1172 (11th Cir. 1996)).

In this case, proportionality should and must be considered under the rubric of Chapter 162, Fla. Stat., and Chapter 22, DCO. Both chapters set forth the limited range of daily accruing fines that may be imposed for original or repeat violations of any municipal ordinance. In other words, both the Florida Legislature and the City's Board of Commissioners have determined legislatively the proportionality of fines assessed for violations and repeat violations of any municipal ordinance, including those governing the maintenance of yards. They have determined that compliance with municipal codes furthers the public health, safety, and welfare. Further, they have determined that limited daily accruing fines are "proportional" to the harm caused by the violation or repeat violation of municipal ordinances and, most importantly, they have conveyed to enforcement boards the authority to consider the amount of fines within the specific range under identified criteria. In short, proportionality is built into Chapter 162, Fla. Stat., and Chapter 22, DCO.

Plaintiff is likely to rely on cases concerning forfeiture, restitution, and other criminal fines, which are distinct concepts having little utility in noncriminal code enforcement matters. Instead, this case should be analyzed by reference to cases concerning statutorily authorized and limited fines. The Supreme Court has explained that the "judgments about the appropriate punishment for an offense belong in the first instance to the legislature," United States v. Bajakajian, 118 S.Ct.

2028, 2036 (1998), and "[no] matter how excessive (in lay terms) an administrative fine may appear, if the fine does not exceed the limits prescribed by the statute authorizing it, the fine does not violate the Eighth Amendment." Newell Recycling Co. v. United States Envtl. Prot. Agency, 231 F.3d 204, 210 (5th Cir. 2000). This deference to legislative determinations applies under the Florida Constitution as well. State v. Cotton, 198 So. 3d 737, 741-742 (Fla. 2d DCA 2016) (citing Locklear v. Fla. Fish & Wildlife Conservation Comm'n, 886 So.2d 326, 329 (Fla. 5th DCA 2004) (citing Amos v. Gunn, 94 So. 615 (Fla. 1922)).

The most similar, and therefore the most persuasive, cases show that federal and Florida courts, including this one, have uniformly upheld as constitutional daily accruing fines falling within the range set forth by the applicable legislative body. Moustakis v. City of Fort Lauderdale, 338 Fed. Appx. 820 (11th Cir. 2009) (finding constitutional on a motion to dismiss a $150 daily accruing code enforcement fine which had aggregated to over $700,000 and rejecting violator's claim that Chapter 162 is facially unconstitutional because it fails to include a cap on aggregate fines for remediable violations); 915 SLR LLC v. City of Altamonte Springs, 2014 WL 3809127 (M.D. Fla. August 1, 2014); Marfut v. City of North Port, 2009 WL 790111 (M.D. Fla. March 25, 2009) (finding constitutional a daily accruing code enforcement fine totaling $37,502.20); Conley v. City of Dunedin, 2010 WL 146861 (M.D. Fla. January 11, 2010) (finding constitutional two separate fines issued under the same statutes and ordinances at issue in this case and accruing to a total of $198,000; Riopelle v. Department of Financial Services, 907 So.2d 1220 (Fla. 1st DCA 2005) (finding constitutional daily accruing fines imposed for a business owner's failure to obtain worker's compensation coverage).

That the daily fine imposed here was the maximum permitted by statute for a repeat violation does not alter the result. Plaintiff characterizes the matter of overgrown grass as

"picayune," and asserts the gravity of the violation does not warrant the maximum fine. But the gravity of the violation is only one of the factors considered by a board in imposing a fine—other factors are considered in assessing proportionality. Assuming overgrown grass by itself does not have significant "gravity," as Ficken subjectively contends, the CEB may have weighed the previous violation or the actions taken by Ficken to correct the violation more heavily than the violation itself, warranting the maximum daily fine. To be sure, Ficken's written submissions to the CEB concerning his efforts to mow the lawn and the reasons he was in violation were inconsistent at best. First, he said that Kellum was the man who fixed his lawnmower. Later, according to Ficken, Kellum was the man who mowed the lawn. The CEB may have rejected the inconsistencies as an effort to play on its sympathies with Kellum's passing, and may have believed that Ficken did nothing whatsoever to mow his lawn. Likewise, Ficken's previous violation was at issue and the CEB may have weighed it heavily in deciding to assess the maximum daily fine.

As to the violation itself, Trask, Kepto, and Colbert all testified to the "gravity" of tall grass, including an impact on property values, the possible presence of rats, mice, and vermin, and creating the appearance of abandoned property. (Trask at 52; 58-64; Kepto at 32-35; 37-38; Colbert at 76-78). The evidence shows that the Lady Marion property is effectively abandoned much of the time. In fact, Kristen Mendez, a real estate agent with no interest in the case, believed it to be abandoned in summer 2018 based on its untended yard. So, despite Ficken's entreaties to the contrary, the violation is not trivial, especially when it is chronic. In narrowing his argument to triviality, Ficken is trying to establish excessiveness by reference to lay terms, which the cases show to be inappropriate.

Finally, Ficken may argue the fine is excessive because he was not fined before the 2018 repeat violation. The argument must fail. Neither the enforcement provisions discussed at length

herein nor the cases interpreting them require graduated or escalated fines. Moreover, though Plaintiff may characterize the maximum daily fine as the "nuclear option," the record makes abundantly clear that Ficken thinks very little of his obligation to maintain the property or comply with *any* local government's ordinances, including the City's. The CEB's decision not to fine Ficken for the 2015 violation is not evidence that the instant fine is unconstitutional—instead, it is evidence that the CEB attempted to ensure compliance with the code without fining him, but failed.

### 2. Foreclosure is not subject to Eighth Amendment scrutiny because it is not designed to punish.

There is a "two-step inquiry for determining whether a financial penalty is excessive under the Eighth Amendment." United States v. Viloski, 814 F.3d 104, 108 (2d Cir. 2016). Before considering proportionality, the Court must first "determine whether the Excessive Fines Clause applies at all." Id. at 109. The clause applies only to fines "that may be characterized, at least in part, as 'punitive'—i.e., a fine intended to punish." Id. "In contrast, purely 'remedial forfeitures. . . fall outside the scope of the Excessive Fines Clause." Id.

Whether and to what extent a fine is "remedial" depends upon the facts of the case and not on the legal label assigned to the sanction. Although labels can be instructive, because they tend to correlate to certain purposes—"restitution" is almost always remedial, "civil in rem forfeitures" are typically remedial, and "fines" are typically punitive—courts cannot rely on these labels and must make their own determinations about the nature of the sanction. Austin, 113 S.Ct. 2801, 2810 (1993). Foreclosure actions are *in rem* proceedings instituted against the subject property. Archer v. U.S. Bank National Association, 220 So.3d 477, 478-79 (Fla. 5th DCA 2017).

Though no case directly addresses whether the ability of a local government to foreclose a code enforcement lien under § 162.09 (3), Fla. Stat., implicates the Eighth Amendment, the City respectfully suggests that it does not and should not. A foreclosure remediates the matter of the

unsatisfied lien through an *in rem* proceeding and imposes no penalty distinct from that of the fine which created it. Because it serves to remediate and not to punish, foreclosure does not fall within the ambit of the Excessive Fines Clause.

Should this Court determine otherwise, the City respectfully suggests that foreclosure is proportional for the reasons discussed in Section II B 1 herein.

**C. The City is entitled to summary judgment on Count III because Ficken received due process and because he failed to appeal the code enforcement orders below.**

In Count III, Plaintiffs claim a violation of Ficken's procedural due process rights under the Due Process Clause of the Fourteenth Amendment because the City failed to inform him of his "repeat violator" status and provide him with an opportunity to contest same before it was applied to him. (Dkt. 129-140). The City is entitled to summary judgment because the record shows that his allegations are false. Ficken was informed of his repeat violator status and received notice of all the proceedings in the 2015 and 2018 violations. Further, the claim is barred because Ficken failed to avail himself of the means to address the alleged deprivation.

> **1.    Ficken received due process throughout the City's code enforcement proceedings.**

The fundamental requirement of due process is the opportunity to be heard "'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 96 S.Ct. 893, 902 (1976); Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994) ("Due process entitles an individual to notice and some form of hearing before state action may finally deprive him or her of a property interest").

The allegation that Ficken did not receive due process is belied by the evidence. McHale's affidavit and Ficken's own testimony speak for themselves and do not require elaboration as to the

notice provided Ficken or his opportunity to be heard. That he opted not to or was not able to attend the properly noticed hearings does not establish a procedural due process violation.

His claim that the City failed to notify him that he was classified as a repeat offender is not supported by the evidence. He was notified of the potential for classification as a repeat violation first by Kepto's March 30, 2015 email. He was warned again via Kepto's April 8, 2015 email. Most critically, the CEB's May 13, 2015 order finding him in violation, the receipt of which Ficken acknowledged, explicitly informed him that recurring violations would subject him to fines of up to $500/day. The Court need not go further, but Pinellas County also informed him on ten occasions of the consequences of repeat violator status. If Ficken remained ignorant of the provisions of Chapter 162 in 2018, his ignorance was willful.

> ## 2. Ficken's federal due process claim fails because he has not shown constitutionally inadequate process.

Ficken's federal due process claim also fails because, to establish such a claim, he must show (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and, most importantly for the Court's analysis here, (3) ***constitutionally inadequate process***. Foxy Lady, Inc. v. City of Atlanta, Ga., 347 F.3d 1232, 1236 (11th Cir. 2003). The third element dooms the claim.

Even if a deprivation occurs, there is no procedural due process violation unless the state "refuses to make available a means to remedy the deprivation." McKinney v. Pate, 20 F.3d 1550,1563 (11th Cir. 1994) (en banc); see also Foxy Lady, 347 F.3d at 1238; Cotton v. Jackson, 216 F.3d 1328, 1331 (11th Cir. 2000) ("It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim"). Further, it makes no difference whether a complainant has utilized the available remedy. Horton v. Board of County Com'rs of Flagler County, 202 F.3d

1297, 1300 (11th Cir. 2000); <u>see also</u> <u>McKinney</u>, 20 F.3d at 1565 ("The fact that [the plaintiff] failed to avail himself of the full procedures provided by state law [i.e. the post-termination remedies] does not constitute a sign of their inadequacy").

Even if Ficken had not been provided due process, the City is still entitled to summary judgment because § 162.11, Fla. Stat. and § 22-83, DCO, provide for appeal to the state circuit court of final orders issued by the CEB. The ability to appeal to state court more than satisfies the requirement that the state provide a remedy, <u>Cotton</u>, 216 F.3d at 1331. Due process would have been reviewed had the state circuit court been asked. "Where a party is entitled as a matter of right to seek review in the circuit court . . . the circuit court ***must determine whether procedural due process is accorded***. . ." <u>City of Deerfield Beach v. Vaillant</u>, 419 So.2d 624, 626 (Fla. 1982) (emphasis supplied). Further, second-tier certiorari review of the circuit court's decision is available pursuant to Fla. R. App. P. 9.030 (b) (2) (B). <u>See</u> e.g <u>14269 BT LLC v. Village of Wellington</u>, 240 So.3d 1 (Fla. 4th DCA 2018).

Chapter 162, Fla. Stat. and Chapter 22, DCO, provided an opportunity for Ficken to seek review before the state court of the procedural due process issues he now brings to this Court. The undisputed fact is that Ficken did not file any appeal of any order entered by the CEB. Therefore, summary judgment must be entered for the City.

**D.  The City is entitled to summary judgment on Count IV because Florida law requires that Ficken exhaust administrative remedies before asserting procedural due claims.**

In Count IV, Plaintiff asserts a procedural due process violation under the Florida Constitution based on the same allegations of Count III. (Dkt. 22 at ¶¶ 141-152). Florida's constitutional provision ensuring due process is interpreted consistently with federal law. <u>See</u> e.g. <u>Scull v. State</u>, 569 So.2d 1251, 1252 (Fla. 1990) ("The essence of due process is that fair notice

and a reasonable opportunity to be heard must be given to interested parties before judgment is rendered" (citing <u>Tibbetts v. Olson</u>, 108 So. 679, 688 (1926) (Whitfield, J., concurring)).

As set forth in Section III (C) 1 herein, Plaintiff received due process and summary judgment is warranted for the City. Plaintiff's as-applied claim also fails under state law because Ficken failed to exhaust his administrative remedies by failing to appeal any of the CEB's orders. This Court in <u>Conley</u> addressed a similar failure in analyzing plaintiffs' procedural due process claim under the Florida Constitution:

> Before the [Plaintiffs] can challenge the City's action as applied to them on state constitutional grounds, Florida law requires [them] to exhaust their administrative remedies . . . The requirement that litigants exhaust their administrative remedies before suing not only serves the courts, by forcing an agency to create a record of its decisions, but the requirement also serves the citizenry, by allowing citizens to resolve disputes locally in an administrative setting.

> <u>Conley</u>, 2010 WL 146861 at *6.

To the extent Plaintiff is mounting a facial challenge (and the City notes again that counsel has affirmatively denied same), "Chapter 162's constitutionality has been addressed before." <u>Lindbloom v. Manatee County</u>, 2019 WL 2503145 (M.D. Fla. June 17, 2019) (citing to <u>Michael D. Jones, P.A. v. Seminole County</u>, 670 So.2d 95 (Fla. 5th DCA 1996)), where the court rejected the argument that the chapter violated the Florida Constitution by establishing a "rogue" judicial system)). Chapter 22 of the City's Code is identical to Chapter 162, Fla. Stat. Hence, the City is entitled to summary judgment on Count IV because both chapters provide extensive protections against deprivations of the property interests of those who violate municipal codes and means to appeal orders issued under their authority.

WHEREFORE, for the reasons stated herein, the City respectfully requests this Court enter an order granting summary judgment to the City on all counts along with such other relief as the Court deems appropriate.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 10th, 2020, I electronically filed this Motion with the Clerk of the Court using the CM/ECF system, which will provide electronic service of same to Ari S. Bargil, Esq. at abargil@ij.org, and Andrew H. Ward at andrew.ward@ij.org, attorneys for Plaintiffs.

/s/ Jay Daigneault, Esq.
Jay Daigneault, Esq. - FBN 0025859
Randy Mora, Esq. - FBN 0099895
1001 South Fort Harrison Ave.,
Ste. 201 Clearwater, Florida 33756
(727) 733-0494 – Phone
(727) 733-2991 – Fax
Primary: jay@cityattorneys.legal
Primary: randy@cityattorneys.legal
Secondary: jennifer@cityattorneys.legal
*Attorneys for Defendants*