UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAMES FICKEN, trustee,
SUNCOAST FIRST TRUST; and
SUNCOAST FIRST TRUST,

    Plaintiffs,

vs.

Case No.: 8:19-cv-01210
State Ct. Case No.:19-003181-CI

CITY OF DUNEDIN, FLORIDA
et al.,

    Defendants.
_____/

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
DISPOSITIVE MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

    Defendants, CITY OF DUNEDIN, FLORIDA, DUNEDIN CODE ENFORCEMENT BOARD (the "CEB"), MICHAEL BOWMAN, LOWELL SUPLICKI, ARLENE GRAHAM, KEN CARSON, WILLIAM MOTLEY, DAVE PAULEY, and BUNNY DUTTON (collectively, the "City"), respond to Plaintiffs' Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law (Dkt. 43). The City respectfully request Plaintiffs' motion be denied and its Dispositive Motion for Summary Judgment (Dkt. 42) granted. In support thereof, the City states:

    1.    This case is proceeding on Plaintiffs' Amended Complaint filed on September 27, 2019 and containing four counts. (Dkt. 22). The parties have engaged in discovery and filed competing motions for summary judgment on April 10, 2020. (Dkt. 42 and 43).

    2.    Because the undisputed facts demonstrate that the fines issued to Plaintiffs are constitutional, and because they also demonstrate that Plaintiffs were afforded procedural due process and are unable to establish a violation of due process, Plaintiffs' motion should be denied and the City's granted.

1

**MEMORANDUM OF LAW**

**I.     Introduction**

What shocks the conscience in this matter is not the daily accruing code enforcement fine imposed upon Jim Ficken for a repeat violation of the City's code, but rather Ficken's unceasing avoidance of accountability for his own property and his belief that his absence from the state of Florida equates to and justifies a suspension of the obligation to maintain it. In his Dispositive Motion for Summary Judgment, Ficken continues to advance the demonstrably false narrative that he was the elderly, unwitting victim of the City's "gotcha"-style enforcement of its code who could not tend to his property due to a myriad of circumstances beyond his control. But the evidence shows that Ficken is an absentee, neglectful landowner who, regardless of the reasons, has repeatedly violated the City's code and used the City's code enforcement inspectors as his property manager. His account of events may have appeal in the media, from which he gleans most of the "evidence" in support of his motion, but it fails in this Court of law for the reasons explained herein and in the City's Dispositive Motion for Summary Judgment. (Dkt. 42).

In this response to Ficken's motion, the City focuses on the "two central questions" posed by it: (1) "can the government impose a $30,000 fine—and threaten to take someone's house—for the 'crime' of having tall grass?;" and (2) "does due process allow for the imposition of such fines without any notice at all?" (Dkt. 43 at 16). Because both questions have a fallacious factual premise, the City will first rephrase the questions considering the true facts of the case then explain why Ficken's motion should be denied and the City's granted.

**II.     A code enforcement board may impose a $500 per day daily accruing fine for a repeat code violation and foreclose the lien arising from such fine against the non-homesteaded real property of the repeat violator.**

Ficken first invites this Court to answer in the negative his inaccurate and self-serving query, "can the government impose a $30,000 fine—and threaten to take someone's house—for the 'crime' of having tall grass?" (Dkt. 43 at 16). But the undisputed evidence shows that (1) the Dunedin Code Enforcement Board imposed not a $30,000 fine, but a daily accruing fine of $500.00 per day for each day of Ficken's repeat code violation; (2) though Ficken arguably lived in the property at issue (the "Lady Marion property") during the summer of 2018, the property did not and does not enjoy homestead protection under the Florida Constitution; (3) Ficken owns at least four other houses in Florida through his land trusts, including one in Clearwater that has enjoyed constitutional homestead protection for almost thirty years (see Dkt. 42 at 4-6, 11-14); and (4) Ficken was fined pursuant to Chapter 162, Fla. Stat., Part I, The Local Government Code Enforcement Boards Act, and Chapter 22, Dunedin Code of Ordinances ("DCO") for violation of a City ordinance. He was not accused of or prosecuted for committing a crime. Both chapters exist "to promote, protect, and improve the health, safety, and welfare of the citizens of . . . the municipalities of this state" by providing "an equitable, expeditious, effective, and inexpensive method" of enforcing municipal codes. § 162.02, Fla. Stat.; § 22-1, DCO.

Considering Ficken's distortion of the facts, the issue before the Court is stated properly as follows: *can the government impose a $500.00 per day daily accruing fine for a repeat code violation and foreclose the lien arising from such fine against the non-homesteaded real property of the repeat violator?* Because the answer is "yes," the City respectfully requests that the Court deny the instant motion and grant the City's Motion for Summary Judgment.

### A. The cases relied upon by Ficken are not relevant to the issue.

As the City expected (see Dkt. 42 at 18), Ficken's motion primarily relies upon cases concerning forfeiture, restitution, and other criminal fines, and unilaterally narrows the principle of proportionality to the purported triviality of overgrown grass. (Dkt. 43 at 16-20). This approach is in keeping with that of the Amended Complaint, which characterizes the matter of "tall grass" as "picayune." (Dkt. 22 at 1). Ficken's subjective assessment of the violation and his dramatic comparison of it to a "crime" are not part of the constitutional inquiry and the cases cited are not helpful to this Court's analysis because (1) they arise under starkly different factual scenarios; and (2) the analysis of constitutionality is fact-specific.

Ficken leads off his proportionality analysis with two criminal forfeiture cases, United States v. Bajakajian, 524 U.S. 321 (1998) and United States v. Heldeman, 402 F.3d 220 (1st Cir. 2005) and, with the creative use of brackets and ellipses, suggests to this Court that the instant case should be analyzed similarly. (Dkt. 42 at 16-17). The proportionality factors utilized by the Heldeman court, based on Bajakajian, were: "(1) whether the defendant falls into the class of persons at whom the *criminal* statute was principally directed; (2) other penalties authorized by the legislature (*or the Sentencing Commission*); and (3) the harm caused by the defendant." Heldeman, 402 F.3d at 223 (emphases supplied to show points of omission in Ficken's motion). The cases are inapposite because they concern criminal forfeitures and not legislatively authorized daily accruing fines, and Ficken's reliance on them to justify the injection of proportionality factors is misplaced.

Then, Ficken urges the Court to adopt and apply the "proportionality factor[]" of "culpability," and does so by uncontextualized reference to two cases which could not have less in common with the facts of this case. (Dkt. 43 at 17). Ficken limits his bare recitation of the

Second Circuit case to the incomplete statement that "[c]ulpability. . . is relevant to . . . excessiveness." (Dkt. 43 at 17). The unabridged excerpt reads that "the culpability *of a claimant* is relevant to *our* excessiveness determination," indicating the court's acknowledgment of the fact-specific nature of its inquiry. von Hofe v. United States, 492 F.3d 175, 185 (2d Cir. 2007) (emphasis supplied to show points of omission in Ficken's motion).

In that case, the Second Circuit Court of Appeals reviewed the district court's statutorily-mandated excessiveness determination under the Civil Asset Forfeiture Reform Act ("CAFRA") after the government sought forfeiture of real property owned by a husband and wife where the husband was involved in the cultivation and sale of marijuana at the property, but the wife was not. The district court upheld the forfeiture under the Eighth Amendment as to both spouses' interests, but the circuit court reversed as to the wife based on her lack of knowledge of and participation in the crime—in other words, her culpability. Id. The circuit court acknowledged the "fact-intensive" nature of the inquiry, and fashioned the following test for the unique analysis presented by the facts:

> (1) the harshness, or gross disproportionality, of the forfeiture in comparison to the gravity of the offense, giving due regard to (a) the offense committed and its relation to other criminal activity, (b) whether the claimant falls within the class of persons for whom the statute was designed, (c) the punishments available, and (d) the harm caused by the claimant's conduct;
> (2) the nexus between the property and the criminal offenses, including the deliberate nature of the use and the temporal and spatial extent of the use; and
> (3) the *culpability of each claimant*.
>
> Id. at 186 (emphasis supplied).

Likewise, in the next case cited by Ficken, the Ninth Circuit Court of Appeals in United States v. Ferro, 681 F.3d 1105 (9th Cir. 2012) reviewed and reversed the district court's finding of proportionality under CAFRA for the forfeiture of a gun collection worth $2.55 million that had

5

been transferred by a husband to a wife. The circuit court determined that the district court misapplied the excessiveness inquiry because it "focused solely on [the husband's] conduct and did not consider [the wife's] culpability, even though the punishment was actually levied on her . . ." Id. at 1114-1115. The court was charged with determining the extent of the wife's involvement in and knowledge of her husband's crime in order to complete its Eighth Amendment proportionality analysis.

In both Ferro and von Hofe, the appellate courts were concerned with the level of culpability as between two persons relative to the crime that led to the forfeiture under review. In this case, it has not and cannot be argued that Ficken is not singularly responsible for the repeat violation, despite his plea that he "was in another state when this matter began." (Dkt. 43 at 26). While the courts' fashioning of the articulated test was warranted and sensible under the unique facts of those cases, the facts of this case are different.

### B. The fines in this case are constitutional even if the Court applies the factors suggested by Ficken.

Should the Court elect to adopt the random selection of proportionality factors advanced by Ficken, the fine at issue remains constitutional under the Eighth Amendment and the Florida Constitution.

First, Ficken unquestionably falls into the class of persons at whom the ordinance was principally directed. Section 34-31, Dunedin Code of Ordinances ("DCO"), entitled "Excessive growth of weeds, grasses, or turf," provides that "[i]t shall be unlawful ***for any person who shall own, control, or occupy any lot, parcel of land or premises in the City*** to allow weeds, grasses, or turf to grow up on such lot, parcel of land, or premises to a height exceeding ten (10) inches" (emphasis supplied). Section 302.4 of the International Property Maintenance Code, adopted into the City's code via § 105-41.9.1 of its Land Development Code, reads similarly. The undisputed

6

facts show that Ficken is a person who owns, controls, or occupies a lot, parcel of land, or premises located in Dunedin and that he repeatedly and admittedly has allowed weeds, grasses, and turf to grow to a height exceeding ten inches. (Dkt. 43-7 at ¶ 7). Hence, the ordinances prohibiting overgrowth are directed specifically and unequivocally at him.

Next, Ficken argues based on the grievously misstated testimony of City code inspectors Mike Kepto and Tom Colbert (Dkt. 42 at 17) that $500 fines for landscaping violations are not intended for him, but he is wrong. First, § 162.09 (2) (a), Fla. Stat., and § 22-79 (d), DCO, read in relevant part that: "[a] fine imposed pursuant to this section shall not exceed $250 per day for a first violation and shall not exceed $500 per day for a repeat violation . . ." Neither the state statute nor the City's code draw the distinction advanced by Ficken in his motion vis-à-vis "vacant properties and property owners owned by absentee landlords and neglectful institutional owners." (Dkt. 43 at 17). Instead, they create two classes of fines: those for first violations, and those for repeat violations. As a repeat violator, Ficken again falls squarely within the class of persons to whom the law is principally directed.

Moreover, and though neither Kepto nor Colbert are responsible for imposing fines or determining to whom laws are principally directed as inferred by Ficken, the evidence shows that he is an absentee and neglectful property owner.[1] The undisputed facts show that Ficken spent two-hundred and one (201) days of 2018 (including most of the summer) in South Carolina and, between 2015 and 2018, spent an average of two-hundred sixty nine (269) days of each year there. (Dkt. 47-1 at 2). While the City is cognizant of and sympathetic to Ficken's care for and

---

[1] Ficken is not an absentee landlord since there is no evidence that any of his multiple properties, including the Lady Marion property, have been rented. Perhaps a tenant would have paid more attention to the condition of the property than Ficken.

7

loss of his mother, circumstances which could have been explained to the Code Enforcement Board had he appeared before it in 2015 or 2018, the fact is that he is an absentee, neglectful property owner.[2] Many Florida residents are part-time or seasonal, and many have or have had personal or business matters drawing them away for periods of time. Yet each remains responsible for the maintenance of their property. And while Ficken has opted to utilize land trusts to hold his various properties rather than an "institutional" form of ownership, the distinction is one without a difference as he is the very embodiment of the term "neglectful."

The fact is that Ficken is a real estate investor who "lived" at the Lady Marion property in 2018 only because he was renovating his homesteaded property in Clearwater (Dkt. 42-1 at 96-97). Further, he "lived" at the Lady Marion property only between July 19 and August 25 of the three-month summer. (Dkt. 47-1 at 2). The unattended condition of the property caused Kristen Mendez, a real estate professional, to believe it unoccupied and possibly ripe for sale. (Dkt. 42-8).

Further supporting the proposition that "[p]eople like [Ficken]" are the reason the CEB may impose a $500 per day for tall grass is Ficken's own testimony. Ficken argues that "because [he] lives it the property, he was able to take immediate action to bring it into compliance ***when he found out he would get fined***" or, in other words, when the matter was brought to his attention by the City's code enforcement inspector, which he alleges to have occurred on August 20. (Dkt. 43-2 at ¶ 18) (emphasis supplied). But, he "noticed the height of the grass" immediately upon returning from South Carolina on July 19 and began to cut it. (Dkt. 43-2 at ¶ 17). According to the declaration filed in support of his motion, he had to stop cutting it because his lawnmower

---

[2] Ficken's absence from the 2018 CEB hearing was not prompted by specific events attendant to the administration of his deceased mother's estate. Instead, he simply did not wish to change his travel plans. (Dkt. 42-1 at 129).

8

malfunctioned. (Dkt. 43-2 at ¶ 17). According to his deposition testimony, he completed the cut on July 20 after repairing the lawnmower himself. (Dkt. 42-1 at 131). He first told the CEB via letter dated August 24 that the man who repaired his mower (Russ Kellum) had died during his absence, then later that Kellum was instead the man who periodically mowed his lawn. (See Dkt. 42 at fn. 13).

Ficken's shifting stories are troubling, indeed, but do not change the result. If Ficken cut the grass on July 20 as alleged in deposition, he then let it grow until August 20. If he failed to complete it on July 20 due to the malfunctioning mower, he then let it grow until August 20. He did not replace the mower and he did not hire someone else to mow the lawn.[3] He did nothing until his interaction with Colbert on August 20, after which he purchased a new lawnmower, but all the while his lawn did what lawns do in Florida in the summer—it grew. (Dkt. 43-2 at ¶ 17).[4]

As he had done in the past, Ficken maintained his property only when notified by the City's code enforcement staff—he had turned them into his unpaid property managers. Ficken's attorneys proudly admit as much: "Indeed, the compliance pattern established by the record [is] that Jim mows his grass *right after the City tells him to*. . ." (Dkt. 43 at 18) (emphasis supplied). This property maintenance strategy may be effective before a first violation is established because the code inspector is required to give a violator a reasonable time to comply (which the City did ten times prior to the 2015 violation), but it is a riskier approach once the violator becomes a repeat

---

[3] Ficken complains that the City could have mowed the property or hired someone to do it for between $40 and $120. (Dkt. 43 at 18-19). He fails to explain why he could not have done the same, or why the City should manage his property.

[4] Of course, Colbert has no authority to issue a fine of any kind. Though Colbert denied having made it, the statement is, at best, a prediction of what he thought would occur at a subsequent CEB hearing.

violator because no correction time is required. § 162.06 (3), Fla. Stat.; § 22-73 (a), DCO. People like Ficken are precisely the reason why the CEB can fine repeat violators the maximum daily amount permitted by the statute, because by August 20 he had done virtually nothing since July 20 to correct a repeat violation he knew to exist and had no intention of correcting until forced to by the City. § 162.09 (2) (b), Fla. Stat.

Ficken's arguments that the CEB could have fined him a lesser amount and that his violation caused no harm to the City are equally unavailing. As anticipated by the City (Dkt. 42 at 20-21), he argues first that the fine at issue was "the City's very first fine against Jim (for anything, ever) . . ." (Dkt. 43 at 17). But the fact is that Ficken had been found in violation of the very same code at the very same property in 2015 and had been cited ten times before that for the same violation at the same property. (Dkt. 42 at 7). He was not fined by the CEB in 2015 but was warned explicitly that a repeat violation could lead to fines of $500 per day. The CEB also could have fined Ficken in August 2018 for a repeat overgrowth violation at his other property in the City on Highland Avenue, but did not. (Dkt. 42 at 14). Now, Ficken weaponizes the CEB's decisions not to fine him in 2015 and August 2018, essentially arguing that constitutional proportionality requires escalating fines. None of the cases which are actually applicable to these facts (or any other cases, for that matter) require previous fines or gradually increasing fines, and the paradox created by the argument shows why this factor has no place in the analysis of the instant case.

The alleged lack of harm, which the City addresses in its own motion (Dkt. 42 at 20), is evidenced by Ficken in the instant motion by the undersigned counsel's statement during oral argument before a state appellate court on an unrelated case that the City is not "going to collapse institutionally as a result of a lawn that went unmowed for over a day. . ." (Dkt. 43 at 18). Ficken

casts the statement as the City's admission that his "tall grass has caused zero harm to his neighbors or the government." It is no such thing. To the extent the statement is evidence at all,[5] whether a violation causes harm and whether it causes institutional collapse are simply not the same. It is a false equivalence which cannot be taken seriously. Should the Court be inclined to review the full oral argument from which Ficken selectively quotes, it will find the case very different, particularly inasmuch as the property owner in that case did not cause harm to the City by repeatedly violating its code and conscripting its code inspectors to manage his property.

The record is clear that Ficken thinks little of his obligation to maintain his various properties in compliance with local codes. Indeed, it is Ficken himself, and not the City, who is responsible for monitoring and maintaining his property. Nevertheless, it cannot be reasonably disputed that the regular maintenance of residential property, including the trimming of grass and weeds, is societally desirable and furthers the public health, safety, and welfare. Moreover, and as the City argues in its motion, the CEB may have weighed the previous violation and any actions to correct the violation (or Ficken's lack thereof, considering his shifting story regarding same) more heavily than the "tall grass," justifying the imposition of the maximum daily fine for a repeat violation. (Dkt. 42 at 20); § 162.09 (3) Fla. Stat.; § 22-80 (a), DCO.

---

[5] "As a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." M/V Am. Queen v. San Diego Marine Const. Corp., 708 F.2d 1483, 1491 (9th Cir. 1983); accord Rickett v. Jones, 901 F.2d 1058, 1062 n. 5 (11th Cir. 1990) ("we ought to take no notice of evidence in other cases to supply facts essential to support an outcome in the present case). Further, the statement cited is attorney argument, not record evidence, and therefore improper to rely upon. See e.g. Wi-LAN USA, Inc. v. Ericsson, Inc., 675 Fed. Appx. 984, 990–91 (Fed. Cir. 2017), citing Gemtron Corp. v. Saint–Gobain Corp., 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("Saint-Gobain's unsworn attorney argument to the contrary—made for the first time at oral argument on appeal—is not evidence and cannot rebut the video and other admitted evidence concerning Saint-Gobain's manufacturing process").

      **C.**      **The cases previously argued by the City are factually similar, deal with the same statutes at issue here, and demonstrate the constitutionality of the fines.**

In sum, Ficken attempts in his motion to add factors to the proportionality analysis that are not compelled by the facts of this case. He does not explain why the cases should be considered by this Court and instead relies only on partial quotes offered without context.

The City respectfully suggests that the cases appropriate for consideration under both the Eighth Amendment and the Florida Constitution are those concerning legislatively authorized daily accruing civil fines, all of which hold that those falling within the range prescribed by the legislature are presumptively constitutional. In the interest of judicial economy, the City hereby incorporates as if set forth in full its arguments concerning those cases in its Dispositive Motion to Dismiss the Amended Complaint and its Dispositive Motion for Summary Judgment (Dkt. 24 at 11-14; Dkt. 42 at 19-21) and emphasizes again that the cases should guide the Court's analysis of this case as they arose under Chapter 162, Fla. Stat., and other statutes authorizing daily accruing fines. Those cases demonstrate that the fines at issue here are constitutional under the Eighth Amendment and Art. I, § 17 of the Florida Constitution, and Ficken's motion should be denied.

**III.**    **Ficken cannot establish a procedural due process violation under the Fourteenth Amendment or the Florida Constitution. Assuming he could, he was accorded due process.**

The second of Ficken's inquiries asks, "does due process allow for the imposition of such fines without any notice at all?" (Dkt. 43 at 16). Like the section concerning the fines, the motion on this point is riddled with factual misstatements and omissions which require clarification before the question can be restated accurately.

First, Ficken fails to bring to the Court's attention the material fact that he did not appeal any of the orders emanating from the 2015 or 2018 CEB hearings. (Dkt. 42-1 at 116; 142-147).

Next, the motion asserts that Ficken "was *never* notified by the City that his property was the subject of open code enforcement cases." (Dkt. 43 at 23) (emphasis supplied). This is false, as the notice of violation issued on August 22 indicated the open code enforcement case. (Dkt. 42-4 at 14, ¶¶ 64-69). Once notified, Ficken asserts based on Kepto and Colbert's testimony that a hearing was set merely to decide how much he owed in fines and that, according to them, "fines start accruing from . . . when we first observe that it's a repeat violation." (Dkt. 43 at 23). Of course, neither Kepto nor Colbert possess the authority to determine whether fines will be imposed at all, much less their amount or their accrual date. Those are determined by the CEB based on the evidence presented by the parties at a hearing. To that end, the notice of hearing issued to Ficken concerning the September 4, 2018 proceeding stated as follows: "If you wish to present your side of the case, you must appear before the Code Enforcement board on that date. . . ***You will also have the opportunity to present witnesses as well as question the witnesses against you prior to the Board making a determination***." (Dkt. 42-4 at 137) (emphasis supplied). He did not appear, of course—he was out of town and did not wish to change his travel arrangements. (Dkt. 42-1 at 129).

Further on, Ficken asserts that the City assured him through his representative at the 2015 hearing that he would not be fined $500 per day without notice, which is also false. (Dkt. 43 at 25). The City made no statements whatsoever to Ficken's representative at the 2015 CEB hearing. The statements identified were made by individual members of the CEB, which is a seven-member quasi-judicial body independent of the City. (Dkt. 42-6 at 10-14); § 22-43, DCO. One board member's statements of opinion concerning what might occur at future hearings that may never happen can neither bind the board to a course of action nor establish a due process violation, and Ficken has presented no case suggesting they can.

Regardless of who made the statements, Ficken's recitation of them is inaccurate. What Ficken presents to this Court as the City's "representation that it would *not* do precisely what it did" in fining him $500 per day is nothing of the sort. (Dkt. 43 at 31, emphasis in original). It was the CEB chairperson's statement that a $500 per day fine was not "automatic," which is true. Assuming the matter is relevant at all, the chairperson informed Ficken's representative that Ficken would have the opportunity to present evidence concerning future violations along with any extenuating circumstances (which the 2018 Notice of Hearing explicitly invited him to do). (Dkt. 42-6 at 10-15). The fact is that Ficken was notified of his status as a repeat violator via receipt of the Board Order following the 2015 hearing (Dkt. 42-4 at 117-120) and received notice informing him of his opportunity to heard in September 2018.

What Ficken "lost" as the result of the 2015 violation was not the right to notice and a hearing concerning the 2018 repeat violation, for the law requires both and he received both. Instead, the distinction between first violations and repeat violations is that, in repeat violations, the code inspector "is not required to give the violator a reasonable time to correct the violation." § 162.06 (3), Fla. Stat.; § 22-73 (a), DCO. Ficken's case illustrates the purpose of the distinction. If a violator is forever afforded a reasonable time to correct, then a neglectful property owner has no incentive to take care of his own property proactively—he may simply wait for the jurisdiction to cite him then correct the violation before the date set for compliance. Ficken proudly played this circular game with the City for many years, but the 2015 violation changed his ability to do so.

What Ficken is really complaining about is that neither the state statute nor the City code provision specifies when a repeat violator must be notified of the repeat violation. Considering the foregoing clarifications, the first issue before the Court on the procedural due process claim is *whether § 162.06 (3), Fla. Stat. and § 22-73 (a) were unconstitutionally applied to Ficken because*

14

*he was notified on August 22, 2018 of a repeat violation which began on July 5, 2018?* The second issue is *can a plaintiff establish a procedural due process violation under the federal or state constitution when the government makes available a means to remedy an alleged deprivation and he has failed to avail himself of such remedy?* Because the answer to both questions is "no," the City respectfully requests this Court to deny Ficken's motion and grant its motion.

      **A.**    **Ficken cannot establish a procedural due process violation under the federal or state constitution because a means to remedy any alleged deprivation was made available but not utilized.**

The City addresses the second issue first because its answer renders it unnecessary for the Court to proceed further. This is in keeping with the "longstanding principle of judicial restraint [which] requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." Camreta v. Greene, 131 S.Ct. 2031 (2011) (quoting Lyng v. Northwest Indian Cemetery Protective Assn., 108 S.Ct. 1319, 1323 (1988).

Ficken cannot establish a procedural due process claim under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 because he cannot establish constitutionally inadequate process. He cannot establish the claim under the Florida Constitution because he has failed to exhaust administrative remedies. Again in the interest of economy, the City herein incorporates its argument concerning these points contained in its Dispositive Motion for Summary Judgment. (Dkt. 42 at 23-25).

      **B.**    **Colbert's notification of the violation on August 22, 2018 did not violate Ficken's procedural due process rights.**

A diligent search by the undersigned has revealed no case in state or federal court analyzing the specific provision of Chapter 162 at issue. The City agrees with Ficken that procedural gaps are filled by the common-sense application of basic principles of due process (Dkt. 43 at 23), but disagrees that such a gap exists here. Of course, the basic principles of procedural due process are

15

notice and an opportunity to be heard. Matthews v. Eldridge, 96 S.Ct. 893, 909 (1976). The basic purport of due process is that, before a deprivation of either property or liberty takes place at the hands of the state, the affected person must be forewarned and afforded an opportunity to be heard "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 85 S.Ct. 1187, 1191 (1965).

Here, the undisputed fact is that Ficken received reasonable notice of the September 4 CEB hearing and was advised that he would be able to present his case and cross-examine witnesses before the CEB made its determination (i.e., before the deprivation). The notice provided Ficken was fair and reasonable under the unique circumstances of this case. The City's code inspector was dealing with a property which had been cited for overgrowth eleven times previously, and a property owner whose properties in the City had been cited fifteen times previously for overgrowth. (Dkt. 42 at 12-13). The record demonstrates that Ficken had been proudly utilizing the City as his property manager for years, and that he knew the property was overgrown immediately upon his return from South Carolina. His complaint regarding lack of notice is a thinly veiled attempt to further shift responsibility for his failure to maintain the property onto the City. The effort should be rejected.

WHEREFORE, for the reasons stated herein, the City respectfully requests this Court enter an order denying Plaintiffs' motion and granting summary judgment to the City on all counts along with such other relief as the Court deems appropriate.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 24th, 2020, I electronically filed this Motion with the Clerk of the Court using the CM/ECF system, which will provide electronic service of same to Ari S. Bargil, Esq. at abargil@ij.org, and Andrew H. Ward at andrew.ward@ij.org, attorneys for Plaintiffs.

/s/ Jay Daigneault, Esq.
Jay Daigneault, Esq. - FBN 0025859
Randy Mora, Esq. - FBN 0099895
1001 South Fort Harrison Ave.,
Ste. 201 Clearwater, Florida 33756
(727) 733-0494 – Phone
(727) 733-2991 – Fax
Primary: jay@cityattorneys.legal
Primary: randy@cityattorneys.legal
Secondary: jennifer@cityattorneys.legal
*Attorneys for Defendants*