## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JAMES FICKEN, trustee,
SUNCOAST FIRST TRUST; and
SUNCOAST FIRST TRUST,

      Plaintiffs,

      vs.

CITY OF DUNEDIN, FLORIDA; and
DUNEDIN CODE ENFORCEMENT BOARD,

      Defendants.

_____/

Case No.: 8:19-cv-01210
State Court Case No.: 19-003181-CI

### NOTICE OF FILING SECOND AMENDED COMPLAINT

Plaintiffs Jim Ficken and Suncoast First Trust give notice of their concurrently filed Second Amended Complaint, filed per the Court's direction of September 28, 2020. As is required by Local Rule 4.01, a copy of the Second Amended Complaint is attached to this Notice in its entirety with the amendments incorporated therein.

Respectfully submitted,

/s/ Ari S. Bargil
Andrew H. Ward (NY Bar No. 5364393)**    Ari S. Bargil (FL Bar No. 71454)*
INSTITUTE FOR JUSTICE              INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900         2 S. Biscayne Boulevard, Suite 3180
Arlington, VA 22203                  Miami, FL 33131
Tel: (703) 682-9320                   Tel: (305) 721-1600
Fax: (703) 682-9321                  Fax: (305) 721-1601
Email: andrew.ward@ij.org          Email: abargil@ij.org

**Admitted Pro Hac Vice              *Trial Counsel

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JAMES FICKEN, trustee,
SUNCOAST FIRST TRUST; and
SUNCOAST FIRST TRUST,

      Plaintiffs,

      vs.                            Case No.: 8:19-cv-01210
                                     State Court Case No.: 19-003181-CI

CITY OF DUNEDIN, FLORIDA; and
DUNEDIN CODE ENFORCEMENT BOARD,

      Defendants.

_____/

## <u>SECOND AMENDED COMPLAINT</u>

### I.    INTRODUCTION

This lawsuit challenges a municipal code enforcement regime in which a defendant, the City of Dunedin (the "City"), imposes exorbitant fines on its citizens, often without any notice at all, for picayune code violations like having tall grass. One such Dunedin resident, Jim Ficken, had grass over ten inches for about eight weeks while he was out of town settling his mother's estate. Without any warning, he was hit with daily fines totaling over $29,000. Now, his inability to pay that sum means that the City is going to take his house. This, the city attorney has touted, is Dunedin's "well-oiled machine" of code enforcement at work.

Indeed, a feature of this well-oiled machine is the City's practice of levying fines of up to $500 per day for homeowners it deems to be "repeat violators"—a term it loosely uses to describe anyone alleged to have committed a similar code violation in the past five years. Under such a classification, the City claims that it is empowered to commence fines against a homeowner in the amount of $500 per day without providing any notice whatsoever. Moreover, the City identifies homeowners as "repeat violators," and thus reduces the protections to which they are entitled,

without providing them with notice before applying such classification or advising them of the consequences of such a classification. Such a practice violates the Due Process Clauses of both the U.S. and Florida Constitutions.

The City's code enforcement practice results in fines that can reach into the tens of thousands of dollars or more. If a homeowner is unable to pay, the City obtains a lien on the subject property. And if a homeowner cannot pay off the lien, the City will foreclose. There is no cap on the fines that can be levied, and the City does not care if the property is occupied by a full-time resident. Such practices violate the Excessive Fines Clauses of both the U.S. and Florida Constitutions.

## II.    JURISDICTION AND VENUE

1.      Plaintiffs Jim Ficken and Suncoast First Trust ("Plaintiffs") originally brought this civil rights lawsuit in state court pursuant to the Declaratory Judgments Act, Fla. Stat. §§ 86.011–.111, for violations of the Due Process Clauses of both the U.S. and Florida Constitutions and the Excessive Fines Clauses of both the U.S. and Florida Constitutions.

2.      Plaintiffs seek declaratory and injunctive relief against the City's decision to impose a daily fine of $500 and an aggregate fine of over $29,000 against Plaintiffs, in violation of the Excessive Fines Clauses of the Eighth Amendment to the U.S. Constitution and Article I, section 17 of the Florida Constitution.

3.      Plaintiffs seek declaratory and injunctive relief against the City's decision to foreclose on Plaintiffs' home as a penalty for temporarily having tall grass, in violation of the Excessive Fines Clauses of the Eighth Amendment to the U.S. Constitution and Article I, section 17 of the Florida Constitution.

2

4.      Plaintiffs seek declaratory and injunctive relief against the City's code, insofar as it empowers the City to assess limitless fines, in violation of the Excessive Fines Clauses of the Eighth Amendment to the U.S. Constitution and Article I, section 17 of the Florida Constitution.

5.      Plaintiffs seek declaratory and injunctive relief against the City's unconstitutional practice of commencing fines against so-called "repeat violators" without providing (1) appropriate notice and an opportunity to be heard regarding classification as a "repeat violator" and the consequences of such classification and (2) appropriate notice and an opportunity to be heard regarding an alleged violation before commencing fines against a "repeat violator," in violation of the procedural due process guarantees of both the Fourteenth Amendment to the U.S. Constitution and Article I, section 9 of the Florida Constitution.

6.      This Court has removal jurisdiction under 28 U.S.C. § 1441. The state court originally had jurisdiction under Fla. Stat. §§ 26.012(3), 86.011, and 86.061 and 42 U.S.C. § 1983.

7.      Pursuant to Fla. Stat. § 47.011, venue was proper in the state court because all Defendants reside in Pinellas County, Plaintiffs' causes of action accrued in Pinellas County, and the subject property is located in Pinellas County.

### III.    PARTIES

8.      Plaintiff Suncoast First Trust is a Florida trust and the owner of the subject property, located at 1341 Lady Marion Lane in Dunedin, Florida 34698 (the "House").

9.      Plaintiff James Ficken ("Jim") is the resident of the House. Jim is the sole trustee of Suncoast First Trust and an indirect beneficiary of Suncoast First Trust. Though the House is Jim's primary residence, it does not have homestead protection.

10.     Jim is 70-years old, has virtually no regular income, and resides by himself in the House. He has never married and has no children.

11.     Jim does not have tens of thousands of dollars with which to pay municipal fines for tall grass.

12.     The deadlines the City has imposed on Jim—by which he must pay the City the tens of thousands he owes—have all lapsed, and now he is facing imminent foreclosure.

13.     Defendant City of Dunedin is a municipality incorporated pursuant to Chapter 165 of the Florida Statutes.

14.     Defendant City of Dunedin Code Enforcement Board (the "Board") is a local government code enforcement board appointed and organized under Fla. Stat. §§ 162.01–.13. It is charged with conducting enforcement proceedings for violations of the Dunedin Code. The Board also provides authorization to the City Attorney to initiate action against code enforcement violators, including foreclosure.

## IV.     FACTUAL ALLEGATIONS

### A.     THE CITY OF DUNEDIN, FLORIDA, AND ITS CODE ENFORCEMENT PROCESS

15.     As of July 1, 2017, the U.S. Census estimates that the City of Dunedin has a population of approximately 36,545 people, of which approximately 85.8% are adults.[1]

16.     The City maintains a code enforcement board, the stated purpose of which "is to [help property owners] achieve voluntary compliance" with the City's various codes.[2]

17.     To that end, the City maintains that its "Code Enforcement Inspectors are happy to work with a [sic] residents and property owners to bring their property into compliance with City

---

[1] U.S. Census Bureau, *QuickFacts, Dunedin city, Florida* (July 1, 2017), *available at* https://www.census.gov/ quickfacts/fact/table/dunedincityflorida/PST045217#PST045217.
[2] City of Dunedin, *Code Enforcement Division*, *available at* https://www.dunedingov.com/city-departments/ planning-development/code-enforcement-division.

codes."[3] The City's website further advises that "[o]ften a simple phone call can take care of a potential problem, avoiding letters, appearance at a Code Enforcement Board hearing, and fines."[4]

18.     That does not mean that the City is afraid to take aggressive action against noncompliant homeowners. As the city attorney has explained, "you have to have a strong constitution that you understand that we are going to be [fining people] to get the properties in compliance."[5]

19.     If a property is alleged to be noncompliant, a case number is generated, and notice of violation is supposed to be provided to the property owner.

20.     The notice of violation is required to state, among other things, the alleged violation and a required compliance date.

21.     If a property remains noncompliant upon reinspection at the time of the stated compliance date, a notice of hearing is supposed to be sent to the property owner.

22.     During the hearing, the Board is supposed to "consider[] all code enforcement violations based on testimony and evidence presented at the hearing by the City *and the Respondent (property owner in violation)*" (emphasis added).[6]

23.     If, based on the testimony and evidence, the Board determines that a property is in violation, the Board either sets a new compliance date and/or imposes a daily fine and a date on which the fines will commence.

24.     Once a violation has been determined, the Board is authorized to impose a daily fine.

---

[3] *Id.*
[4] City of Dunedin, *Code Enforcement Process Infographic*, *available at* https://www.dunedingov.com/home/ showdocument?id=10915.
[5] Tom Germond, *Dunedin officials take on nuisance properties*, Tampa Bay Newspapers, April 26, 2018, *available at* https://www.tbnweekly.com/north_county/article_d5fa5700-48aa-11e8-9de0-87fe057cbc9a.html.
[6] City of Dunedin, *Code Enforcement Division*, *available at* https://www.dunedingov.com/city-departments/planning-development/code-enforcement-division.

25.     The maximum daily fine for a violation of the Dunedin Code of Ordinances by a non-repeat violator is $250. If a property owner is deemed a "repeat violator," however, the maximum daily fine for a violation of the Dunedin Code of Ordinances is $500. *See* Dunedin, Fla., Code of Ordinances Part I, Subpart A, Ch. 22, art. III, § 22-79(d).

26.     Moreover, if a property owner is deemed a "repeat violator," according to the City, such person is not entitled to the same notice requirements described above. Rather, the City claims that it is empowered to commence fines immediately and without any notice whatsoever.

27.     The City's Code of Ordinances defines a "repeat violation" as "a violation of a provision of a code or ordinance by a person who has been previously found by the code enforcement board or any other quasi-judicial or judicial process, to have violated or who has admitted violating the same provision within five years prior to the violation." Dunedin, Fla., Code of Ordinances Part I, Subpart A, Ch. 22, art. III, § 22-42.

28.     Although the City's own ordinance requires an adjudication on an alleged violation to be deemed a repeat violator, the City routinely applies the "repeat violator" classification to individuals who were never fined or otherwise subject to traditional enforcement actions.

29.     For property owners who are treated as "repeat violators" by the City, fines begin to accrue *immediately* and without any formal determination or adjudication by the Board. A hearing is eventually held on the matter; however, unlike the traditional process, the purpose of the hearing for "repeat violators" is twofold: to determine liability and—rather than setting a compliance date—to calculate the fines that have already begun to accrue.

30.     If a code enforcement violation is deemed "irreparable or irreversible," there is a maximum fine of $5,000, regardless of whether the property owner is a "repeat violator."

31.     Otherwise, there is no limit to the total amount of fines the city can impose.

6

32.     The City does not consider a property owner's ability to pay when assessing daily fines.

33.     Additionally, despite the City's purported willingness to work with property owners, the City does not consider requests for fine reconsideration in code enforcement cases involving "repeat violators." Nothing in the City's ordinances or Florida statutes establishes that "repeat violators" are forbidden from seeking reconsideration of their fines. But that is the City's position.

34.     The City can, and does, impose daily fines that, when aggregated, reach tens of thousands of dollars. Many of these fines are for violations that have nothing to do with public health or safety, like having grass longer than ten inches.

35.     But imposing fines is not the only way the City can achieve its stated goal of bringing properties into compliance. For example, the City is empowered to remedy many code violations and invoice the property owner accordingly. *See* Dunedin, Fla., Code of Ordinances Part I, Subpart A, Ch. 34, art. II, § 34-33(b)(1).

36.     Both the mayor and at least one member of the Dunedin City Commission have suggested that such a course of action may be preferable to protracted code enforcement proceedings and fines, specifically for instances in which the alleged infraction is for tall grass.[7]

**B.     THE CITY'S IMPOSITION OF LIENS AND FORECLOSURES**

37.     Once a violation has been found and a compliance date has been set by the Board, a property owner must fix the violation or risk additional fines.

38.     If a property remains in a state of noncompliance beyond the compliance date set by the Board, the city attorney may seek the issuance of an order of lien against the property.

---

[7] *See* Minutes of the City Commission Regular Meeting of October 4, 2018, p. 18-9 (Mayor Bujalski "referr[ing] to a photograph . . . and what bothered her was the high grass and five or six years ago the Commission gave carte blanche to staff to mow the grass and charge people"), *available at* http://dunedin.granicus.com/DocumentViewer .php?file=dunedin_702fb4076ed89647edcbfd806cdc9db9.PDF&view=1.

39.     If the underlying violation has been remedied by the time an order of lien is issued, the amount of the lien will be the amount of the fines due when the lien issued, plus interest. If the underlying code violation still exists when an order of lien is issued, the lien is for the amount of the fine when the lien issued, plus the still-accruing daily fine and interest.

40.     If a property is brought into compliance but the lien remains unpaid, the City may foreclose on the subject property to collect on the lien. Neither the City's ordinances nor Florida statutes establish a date by which the City must foreclose on a property to collect on an unpaid lien.

41.     Accordingly, the City may wait until the value of a lien exceeds the value of the property before initiating a foreclosure action.

42.     Before filing a foreclosure action against a property owner, the city attorney will typically—but is not required to—seek permission from the Board. Thereafter, the city attorney may file the foreclosure action at any time.

43.     Following the foreclosure sale, the City is entitled to full payment of the lien, and any remaining surplus is returned to the former property owner. *See* Fla. Stat. § 45.032. If the amount collected via foreclosure is less than the amount owed to the City, the City may initiate a separate action against the former property owner to collect the difference.

C.      THE CITY OF DUNEDIN'S CODE ENFORCEMENT REVENUE

44.     The City relies on the administration of its code enforcement system as a means for providing revenue for the City's general fund.

45.     Based on information and belief, municipal salaries and expenses are paid with revenue collected from fines.

46.     Based on information and belief, the city attorney's salary is paid, at least in part, with revenue collected from fines and other related assessments such as attorney's fees stemming from collections efforts.

8

47.     The City attorney has described the City's code enforcement system as a "well-oiled machine." Indeed, other city officials have touted code enforcement as "the perfect way to" deal with foreclosed and nuisance properties because it "covers your costs and whatever is left goes into reserves."[8] And former City Manager Robert DiSpirito supported the uptick in enforcement, admitting as early as 2015 that "the revenue is nice."[9]

48.     The City originally turned to code enforcement fines as a source of revenue during the recession, as revenue from property taxes declined and the City experienced a spike in unkempt and abandoned properties during the foreclosure crisis.

49.     The City has been steadily collecting more and more money in fines since the beginning of the foreclosure crisis in 2007.

50.     Although the foreclosure crisis has largely subsided, the amount of money collected in code enforcement fines has continued to increase.

51.     In 2007, the city collected $34,000 in code enforcement fines.

52.     Nearly a decade later, in 2016, the city collected $483,230 in total fines.[10]

53.     In 2017, the city brought in $870,548 in total fines.[11] At least $703,000 of that revenue appears to have been from code enforcement.

54.     In 2018, the city budgeted for an estimated $495,400 in revenue from total fines, but ultimately brought in more than double that amount, with an estimated $1,294,350 in revenue from total fines.[12]

---

[8] *Dunedin officials take on nuisance properties*, Tampa Bay Newspapers, April 26, 2018, *available at* https://www.tbnweekly.com/north_county/article_d5fa5700-48aa-11e8-9de0-87fe057cbc9a.html.
[9] *Dunedin officials praise code enforcement efforts*, Tampa Bay Newspapers, May 27, 2015, *available at* https://www.tbnweekly.com/north_county/dunedin_beacon/dunedin-officials-praise-code-enforcement-efforts/article_ae99cea1-88bb-58c6-8626-167e7dcd6d11.html.
[10] City of Dunedin, *FY 2019 City of Dunedin Adopted Operating & Capital Budget* 62 (2019), *available at* https://www.dunedingov.com/home/showdocument?id=12692.
[11] *Id.*
[12] *Id.*

55.     For fiscal year 2019, the city has budgeted an estimated revenue from fines of $898,400.[13] This amount represents an 81% increase in anticipated revenue from fines compared to the expected revenue from fines in 2018.

56.     Ultimately, between fiscal years 2007 and 2018, the city has increased its revenue from fines by approximately by 3,807%.

57.     When the City exercises its authority to remedy code violations, such a practice is generally revenue-neutral. On the other hand, fines provide a revenue stream for the City.

58.     At all times throughout the course of this process, the City had the authority to mow Jim's grass and send him a reasonable bill. Upon information and belief, the City did not do so because it prioritizes revenue over code compliance.

**D.     THE CITY OF DUNEDIN'S CASE AGAINST THE PLAINTIFF**

59.     In May of 2015, while Jim was in South Carolina tending to his sick mother, he was cited for having tall grass. He mowed his lawn promptly, and he was never fined. Until the code enforcement action at issue in this case, Jim had no interaction with Dunedin code enforcement in the years that followed.

60.     Jim's mother, Marinelle Ficken, is now deceased. But as the sole executor of his late mother's estate, Jim makes regular trips to South Carolina to tend to her affairs, which include preparing her condominium for sale.

61.     Jim has made several such trips in the last several years, dating back to when he would travel there to help take care of her before she passed away. If he expected to be gone for a lengthy period, Jim would arrange to have his lawn mowed, usually by his friend and local handyman Russ Kellum.

---

[13] *Id*. at 63.

62.     Jim was in South Carolina when the code enforcement action in this case commenced. Unbeknownst to him, Mr. Kellum died unexpectedly while Jim was away, leaving the grass to grow unabated. Jim does not dispute that his grass exceeded ten inches in height for at least part of this time.

63.     Because Jim had been the subject of a code violation matter in May 2015 for having tall grass, the City classified him as a repeat violator.

64.     Because of Jim's previous instance of tall grass in 2015, and his resultant "repeat violator" status, Jim lost his entitlement to the notice and opportunity to be heard to which non-repeat violators are entitled. Indeed, he was unaware that the 2015 matter would result in a "repeat violator" classification and thus his forfeiture of these rights.

65.     Jim has never been afforded an opportunity to be heard before the City classified him as a "repeat violator."

66.     When the City began fining Jim on July 5, 2018, he received no notice, and the City immediately began to impose the maximum fine of $500 per day. Upon information and belief, this is because Jim was classified as a "repeat violator," and thus the City provided no such notice.

67.     By the time Jim returned from South Carolina, on July 19, 2018, he was already indebted to the City for two-weeks' worth of fines, or about $7,000. Jim still had no idea, however, that he was being fined. Upon information and belief, this is because Jim was classified as a "repeat violator," and thus the City provided no such notice.

68.     Jim did not like the look of his lawn, and having learned of Mr. Kellum's death, knew he would have to cut it himself. Jim still had no idea, however, that he was being fined. Upon information and belief, this is because Jim was classified as a "repeat violator," and thus the City provided no such notice.

69.     On or about July 21, Jim attempted to mow his lawn, but his mower malfunctioned before he could completely finish the job. The City's code enforcement staff did not recognize the mowing as sufficient, and thus the fines continued. Jim still had no idea, however, that he was being fined. Upon information and belief, this is because Jim was classified as a "repeat violator," and thus the City provided no such notice.

70.     On August 20, Jim was outside his property when a code enforcement officer making his daily inspection finally spoke to Jim. The officer advised Jim, for the first time, that he was "going to get a big bill from the city."

71.     Jim asked the code enforcement officer to return in two days, by which time, he promised, the lawn would be mowed.

72.     Later on August 20, just after Jim learned he was being fined, he went to Wal-Mart and bought a new lawnmower.

73.     On August 21, he cut the grass as promised. By then, it had been roughly 48 days since the City began fining Jim.

74.     All told, by the time Jim learned of the fines and took immediate corrective action, he already owed the City $23,500.

75.     On or about August 21, Jim received, for the first time, a letter from the City providing him with formal notice of the potential daily fines he was facing. In that same letter, he was advised that a hearing on the fines would be held on September 4, 2018.

76.     Jim was scheduled to return to South Carolina before the September 4 hearing. He made two separate requests—orally on August 24 and in writing on August 27—to have his hearing postponed. Both requests were rejected. Instead, Jim was told to arrange for someone to appear at the hearing on his behalf. Given the short notice, he was not able to do so.

77.     On August 25, Jim returned to South Carolina to resume his work on his mother's estate.

78.     On August 31—roughly ten days after Jim brought his property into compliance and still four days before his hearing—the City began fining Jim *again* for tall grass. As before, Jim was unaware that fines were commencing. Upon information and belief, this is because Jim was classified as a "repeat violator," and thus the City provided no such notice.

79.     On September 4, the City went forward with the hearing on both violations. As Jim had twice advised the City would be the case, he was not present because he had already planned to be in South Carolina at the time of the hearing. In Jim's absence, the city's code enforcement officer testified that Jim's property was in violation from July 5 to August 20, and that a second action had begun on August 31 (and was still open).

80.     The Board determined that Jim "shall suffer a fine of $500 per day for each day that the violation existed," plus interest, with respect to both violations.

81.     On September 11, Don Howard, a gentleman Jim had previously tasked with tending the lawn so he would not incur additional fines, mowed the lawn.

82.     On September 12, the City stopped fining Jim. As the City had once again been fining him at a rate of $500 per day, Jim was deemed to owe an additional $5,000 for this second period of alleged noncompliance.

83.     On September 18, 2018, the City placed the first of two liens on the House. With respect to the first violation, a lien was placed on the House in the amount of $24,454.36, inclusive of initial interest, attorney's fees, and recording costs.

84.     On September 18, 2018, the City also placed the second of two liens on the House. With respect to the second violation, a lien was placed on the House in the amount of $5,379.14, inclusive of initial interest, attorney's fees, and recording costs.

85.     Between the two liens, Jim owes the City $29,833.50 (plus interest) for having tall grass.

86.     The Board has the authority to reduce fines. *See* Dunedin, Fla., Code of Ordinances Part I, Subpart A, Ch. 22, art. III, §§ 22-78 (6), 22-80 (b) ("The code enforcement board may reduce a fine imposed pursuant to section 22-79.").

87.     Jim submitted a written request for rehearing or reconsideration of the fines. Although there is nothing in the City's ordinances or Florida statutes that forbids repeat violators from seeking reconsideration or rehearing, Jim's request was rejected. No explanation was provided. However, upon information and belief, Jim's request was denied because of the City's stated policy that it does not negotiate with repeat violators.

88.     With respect to both liens, Jim was warned that "[i]nterest will continue to accrue at the rate of 6.33% per year until the fine is paid in full."

89.     In a letter dated February 13, 2019, the city attorney advised that "[p]ayment must be made to the City of Dunedin, care of this office, within fifteen (15) days of the date of this letter or we shall have no choice but to pursue foreclosure of the liens." The letter further threatened that Jim would be responsible for litigation costs and attorney's fees.

90.     Although the February 13, 2019 letter advised Jim that the City would "have no choice but to pursue foreclosure," there is no ordinance or statute that actually requires the City to initiate a foreclosure action in this case.

91.     Jim's repeated efforts to obtain an extension of time for compliance with the city attorney's demand were rejected without a counteroffer.

92.     On May 7, 2019, the city attorney requested permission from the Board to foreclose on the House in order to recover on the liens. Permission was granted.

93.     Because Jim does not have the money to satisfy the liens, foreclosure action against the House is now imminent.

## V.     CAUSES OF ACTION

### A.     COUNT ONE – EXCESSIVE FINES UNDER THE U.S. CONSTITUTION

94.     Plaintiffs re-allege and incorporate by reference paragraphs 1–4 and 6–93.

95.     The Eighth Amendment to the U.S. Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

96.     The Excessive Fines Clause of the U.S. Constitution is applicable to the individual states and their municipalities via the Fourteenth Amendment to the U.S. Constitution.

97.     The Excessive Fines Clause prohibits the imposition of monetary fines that are disproportionate to the offense for which they are imposed. A daily fine of $500 and an aggregate fine of over $29,000 are disproportionate to the offense of having tall grass.

98.     As-applied, the City's daily fines of $500 and aggregate fines of over $29,000 are disproportionate to the offense of having tall grass and thus violate the Excessive Fines Clause of the Eighth Amendment.

99.     The Excessive Fines Clause prohibits the imposition of an ultimate penalty that is disproportionate to the offense for which it is imposed. The penalty of losing one's home in foreclosure is disproportionate to the offense of having tall grass.

100.    As-applied, the ultimate penalty imposed by the City—the foreclosure of Jim's home—is disproportionate to the offense of having tall grass and thus violates the Excessive Fines Clause of the Eighth Amendment.

101.    The Excessive Fines Clause prohibits the imposition of fines or penalties that are limitless in nature.

102.    On its face and as-applied, the City's system of limitless fines for all non-irreparable code violations, including unlimited fines for tall grass, violates the Excessive Fines Clause of the Eighth Amendment.

103.    Unless the City is enjoined from collecting fines from Jim that violate his right to be free from excessive fines, Jim will continue to suffer irreparable harm.

104.    Unless the City is enjoined from foreclosing on the House as part an ultimate penalty that violates Jim's right to be free from excessive fines, Jim will continue to suffer irreparable harm.

105.    Jim has no other remedy by which to prevent or minimize this continuing irreparable harm to his constitutional rights.

**B.    COUNT TWO – EXCESSIVE FINES UNDER THE FLORIDA CONSTITUTION**

106.    Plaintiffs re-allege and incorporate by reference paragraphs 1–4 and 6–93.

107.    Section 17 of the Florida Constitution's Declaration of Rights provides that "[e]xcessive fines . . . are forbidden."

108.    Like its federal counterpart, the Excessive Fines Clause of the Florida Constitution necessarily prohibits the imposition of monetary fines that are disproportionate to the offense for which they are imposed. A daily fine of $500 and an aggregate fine of over $29,000 are disproportionate to the offense of having tall grass.

109.    As-applied, the City's daily fines of $500 and aggregate fines of over $29,000 are disproportionate to the offense of having tall grass and thus violate the Excessive Fines Clause of the Florida Constitution.

110.    The excessive fines clause of the Florida Constitution further prohibits the imposition of monetary fines that shock the conscience. A daily fine of $500 and an aggregate fine of over $29,000 for having tall grass shock the conscience.

16

111.    As-applied, the City's daily fines of $500 and aggregate fines of over $29,000 for having tall grass shock the conscience, and thus violate the Excessive Fines Clause of the Florida Constitution.

112.    Like its federal counterpart, the Excessive Fines Clause of the Florida Constitution necessarily prohibits the imposition of an ultimate penalty that is disproportionate to the offense for which it is imposed. The penalty of losing one's home in foreclosure is disproportionate to the offense of having tall grass.

113.    As-applied, the ultimate penalty imposed by the City—the foreclosure of Jim's home—is disproportionate to the offense of having tall grass, and thus violates the Excessive Fines Clause of the Florida Constitution.

114.    The Excessive Fines Clause of the Florida Constitution further prohibits the imposition of an ultimate penalty that shocks the conscience. The penalty of losing one's home in foreclosure for having tall grass shocks the conscience.

115.    As-applied, the ultimate penalty imposed by the City—the foreclosure of Jim's home—for having tall grass shocks the conscience and thus violates the Excessive Fines Clause of the Florida Constitution.

116.    The Excessive Fines Clause of the Florida Constitution prohibits the imposition of fines or penalties that are limitless in nature.

117.    On its face and as-applied, the City's system of limitless fines for all non-irreparable code violations, including unlimited fines for tall grass, violates the Excessive Fines Clause of the Florida Constitution.

118.    Unless the City is enjoined from collecting fines from Jim that violate his right to be free from excessive fines, Jim will continue to suffer irreparable harm.

119.    Unless the City is enjoined from foreclosing on the House as part an ultimate penalty that violates Jim's right to be free from excessive fines, Jim will continue to suffer irreparable harm.

120.    Jim has no other remedy by which to prevent or minimize this continuing irreparable harm to his constitutional rights.

**C.      COUNT THREE – PROCEDURAL DUE PROCESS UNDER THE U.S. CONSTITUTION**

121.    Plaintiffs re-allege and incorporate by reference paragraphs 1 and 5–93.

122.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[n]o state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law."

123.    The Due Process Clause guarantees a fair legal process in adjudicative and quasi-adjudicative proceedings, including code enforcement actions.

124.    Among other things, the Due Process Clause requires that an alleged offender be afforded appropriate notice and an opportunity to be heard regarding an alleged violation of a law or ordinance.

125.    Additionally, the Due Process Clause prohibits the government from imposing penalties, including fines and fees, or adjudicating guilt or innocence before affording appropriate notice and an opportunity to be heard.

126.    The City's failure to inform Jim of the consequences of his "repeat violator" classification and provide him with an opportunity to contest such classification before it was applied to him amounted to a violation of the Due Process Clause of the U.S. Constitution, as Jim was entitled to appropriate notice and an opportunity to be heard regarding his qualification for a legal status that, once applied, would result in the deprivation of certain procedural protections.

127.    Thus, as a result of the May 2015 matter, Jim lost his right to access the City's traditional code enforcement process without the appropriate notice and opportunity to be heard required by federal law.

128.    The City's imposition of fines against Jim, without providing Jim notice that fines were being imposed on an ongoing basis, amounted to a violation of the Due Process Clause of the U.S. Constitution.

129.    As a result of the City's violation of Jim's right to procedural due process, Jim has suffered and continues to suffer irreparable harm.

130.    Unless the City is enjoined from collecting fines from Jim resulting from this violation of his constitutional right to procedural due process, Jim will continue to suffer irreparable harm.

131.    Unless the City is enjoined from foreclosing on the House to collect on fines resulting from this violation of Jim's constitutional right to procedural due process, Jim will continue to suffer irreparable harm.

132.    Jim has no other remedy by which to prevent or minimize the continuing irreparable harm to his constitutional rights.

**D.      COUNT FOUR – PROCEDURAL DUE PROCESS UNDER THE FLORIDA CONSTITUTION**

133.    Plaintiffs re-allege and incorporate by reference paragraphs 1 and 5–93.

134.    The Due Process Clause of Article I, section 9 of the Florida Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law."

135.    The Due Process Clause guarantees a fair legal process in adjudicative and quasi-adjudicative proceedings, including code enforcement actions.

136.    Among other things, the Due Process Clause requires that an alleged offender be afforded appropriate notice and an opportunity to be heard regarding an alleged violation of a law or ordinance.

137.    Additionally, the Due Process Clause prohibits the government from imposing penalties, including fines and fees, or adjudicating guilt or innocence before affording appropriate notice and an opportunity to be heard.

138.    The City's failure to inform Jim of the consequences of his "repeat violator" classification and provide him with an opportunity to contest such classification before it was applied to him amounted to a violation of the Due Process Clause of the Florida Constitution, as Jim was entitled to appropriate notice and an opportunity to be heard regarding his qualification for a legal status that, once applied, would result in the deprivation of certain procedural protections.

139.    Thus, as a result of the May 2015 matter, Jim lost his right to have access to the City's traditional code enforcement process, as is required by Florida law, without appropriate notice and opportunity to be heard ever having been provided.

140.    The City's imposition of fines against Jim, without providing Jim notice that fines were being imposed on an ongoing basis, amounted to a violation of the Due Process Clause of the Florida Constitution.

141.    As a result of the City's violation of Jim's right to procedural due process, Jim has suffered and continues to suffer irreparable harm.

142.    Unless the City is enjoined from collecting fines from Jim resulting from this violation of his constitutional right to procedural due process, Jim will continue to suffer irreparable harm.

143.     Unless the City is enjoined from foreclosing on the House to collect on fines resulting from this violation of Jim's constitutional right to procedural due process, Jim will continue to suffer irreparable harm.

144.     Jim has no other remedy by which to prevent or minimize the continuing irreparable harm to his constitutional rights.

## VI.     PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.     A declaratory judgment that the City's daily fines of $500 and total fines of $29,000 for the offense of having tall grass constitute an excessive fine in violation of the Excessive Fines Clauses of the U.S. and Florida Constitutions;

B.     A declaratory judgment that the City's imminent foreclosure of Jim's home, initiated in order to collect on unpaid liens resulting from the offense of having tall grass, constitutes an excessive fine in violation of the Excessive Fines Clauses of the U.S. and Florida Constitutions;

D.     A declaratory judgment that the City's practice of levying unlimited fines constitutes a facial and as-applied violation of the Excessive Fines Clauses of the U.S. and Florida Constitutions;

E.     A preliminary and permanent injunction prohibiting the City from pursuing fines against Plaintiffs in the amount of $29,833.50 (plus interest);

F.     A preliminary and permanent injunction prohibiting the City from pursuing a foreclosure action against Plaintiffs and the House to collect on unpaid code enforcement liens in the amount of over $29,833.50 (plus interest);

G.     A declaratory judgment that the City's designation of Jim as a "repeat violator," without providing appropriate notice or opportunity to be heard regarding such designation, violates the Due Process Clauses of the U.S. and Florida Constitutions;

H.      A declaratory judgment that the City's failure to provide notice or opportunity to be

heard before determining the existence of a violation and commencing fines violates the Due

Process Clauses of the U.S. and Florida Constitutions;

I.      One dollar in nominal damages;

J.      Reasonable costs and attorney's fees; and

K.      Such other legal or equitable relief as this Court may deem just and proper.


Dated this 30th day of September 2020.

Respectfully submitted,

/s/ Ari S. Bargil

Andrew H. Ward (NY Bar No. 5364393)**            Ari S. Bargil (FL Bar No. 71454)*
INSTITUTE FOR JUSTICE                            INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900                     2 S. Biscayne Boulevard, Suite 3180
Arlington, VA 22203                              Miami, FL 33131
Tel: (703) 682-9320                              Tel: (305) 721-1600
Fax: (703) 682-9321                              Fax: (305) 721-1601
Email: andrew.ward@ij.org                        Email: abargil@ij.org

**Admitted Pro Hac Vice                          *Trial Counsel

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of September 2020, a true and correct copy

of the *Second Amended Complaint* was filed with the Clerk of the Court using the CM/ECF

system, which will send a notice of electronic filing to the following CM/ECF participants:

Jay Daigneault
Randy Mora
TRASK DAIGNEAULT, L.L.P.
1001 S. Ft. Harrison Avenue, Suite 201
Clearwater, FL 33756
Email: jay@cityattorneys.legal
        randy@cityattorneys.legal
        jennifer@cityattorneys.legal

*Counsel for Defendants*


                        /s/ Ari S. Bargil
                        INSTITUTE FOR JUSTICE